433 So.2d 324 (1983)
EXECUTIVE OFFICE CENTERS, INC.
v.
Henry R.J. COURNOYER.
No. CA-0078.
Court of Appeal of Louisiana, Fourth Circuit.
May 20, 1983.
*325 Vallerie Oxner, Metairie, for plaintiff-appellant.
Richard K. Leefe, Leefe & Roniger, New Orleans, for defendant-appellee.
Before AUGUSTINE, BARRY, and KLEES, JJ.
AUGUSTINE, Judge.
This is an appeal from a judgment issuing an injunction to arrest the seizure and sale of the old Queen and Crescent Building. In December, 1978, Executive Office Centers, Inc. ("Executive") sold the twelve-story office building, located at 344 Camp Street in New Orleans, to Henry R.J. Cournoyer for $1,550,000. Executive received $150,000 in cash and a second mortgage on the property for $341,154.56. The sale was subject to a first mortgage in favor of New England Mutual Life Insurance Company, the balance of which was $1,058,845.44.
Executive subsequently filed a suit in which it alleged that the defendant violated portions of paragraph 6(d)[1] of the mortgage which constituted a default, thereby confessing judgment entitling Executive to proceed by executory process. Specifically, Executive claimed that Cournoyer violated that portion of paragraph 6(d) which prohibits entering into a contract or agreement in excess of $15,000 "whereby any lien, privilege, mortgage, or other encumbrance in favor of anyone furnishing labor or material may be recorded against the property." Executive also alleged that the massive renovations occurring in the building without its written approval constituted an "actual or threatened addition to, demolition of, or removal of the building and/or improvement off of the property." The defendant, Cournoyer, sought an injunction to arrest executory process.
The trial court found no violation of paragraph 6(d) which would constitute a default and issued the injunction. Executive appealed. We agree with the trial court and hereby affirm the issuance of the injunction.
*326 On appeal, Executive alleges: 1) that an injunction to arrest executory process should not have been granted because the defendant failed to comply with the procedures outlined in Article 2751 and 2753 of the Louisiana Code of Civil Procedure; and 2) that the trial court erred in determining there was no default under paragraph 6(d) of the mortgage.

I
Executive contends that Cournoyer failed to qualify for relief on any of the grounds listed in C.C.P. Article 2751 and should have been required to provide security for the issuance of an injunction because none of the exceptions to posting security in Article 2753 existed.
Article 2751 provides in part:
"The defendant in the executory proceeding may arrest the seizure and sale of the property by injunction when the debt secured by the mortgage or privilege is extinguished, or is legally unenforceable, or if the procedure required by law for an executory proceeding has not been followed."
The official comments to this article indicate that the article gives in general terms the grounds on which the seizure and sale may be arrested by injunction, but Article 2753 gives specific grounds on which an injunction may be issued without bond. Further, the comments indicate that "it is now definitely settled that the defendant in an executory proceeding is not limited to the specific grounds mentioned in [Article 2753] to obtain an injunction to arrest the seizure and sale. Injunction can be obtained on any valid ground, but security must be furnished by the applicant for injunctive relief, unless he relies exclusively on the grounds mentioned in [Article 2753]." (our emphasis).
Since Article 2753 lists specific grounds on which an injunction can be granted without furnishing security, it must have been contemplated by the legislature that any of the grounds relied upon in Article 2753 must be within the purview of Article 2751. Article 2753 is designed only to list those grounds upon which an injunction can be issued without the requisite security. Any other grounds asserted by the applicant for an injunction require the posting of security before the injunction may be issued. As a result of this reasoning, then, injunctions under 2751 can be granted based on the specific grounds of Article 2753.
We turn now to whether the defendant complied with Article 2753 which provides for those instances in which security is not required for issuance of an injunction to arrest a seizure and sale. Under Article 2753(2), security is not required for an injunction when "enforcement of the debt secured by the mortgage is premature, either because of the original term allowed for payment, or any extension thereof granted by the creditor, had not expired at the time of the institution of the executory proceeding." This suit was instituted in May 1981, two and a half years after the act of credit sale and four years before the expiration of the term allowed for payment.
In addition, subsection 4 of Article 2753 allows the defendant in the executory proceeding to plead a liquidated claim in compensation against the debt secured by the mortgage or privilege and not provide security to obtain an injunction. Cournoyer, in his petition for an injunction and at trial, pleaded a liquidated claim in compensation against the debt, to wit, a set-off in the amount of $135,506.70.[2]
Having made the above allegations, the defendant complied with the provisions of Articles 2751 and 2753 and it was proper to *327 allow the defendant to proceed by injunction to arrest executory process.

II
Concerning the merits of Cournoyer's suit for injunction, the testimony indicates that there was no violation of the $15,000 contract-lien or the demolition provisions. For there to be a default under the contract-lien clause, Cournoyer must have entered a contract or agreement in excess of $15,000 and that agreement must have created a situation whereby a lien or privilege could be recorded against the property. Executive failed to prove the existence of any such contract.
Testimony on behalf of Cournoyer by the building managers, Stanford Latter and Francis Bourque, indicates that all of the contractors employed were aware of the $15,000 contract-lien provision and as a result accepted payments on a weekly basis. The contractors also knew that their services could be terminated on 24 hour notice if the value of the work would approach $15,000. Executive attempted to show at trial that the total value of the labor and material was in excess of $15,000. Additionally, Executive alleged that no contractor would perform the renovations without some basic agreement or contract. The trial court found that although the value of the work which was done over several years exceeded $500,000, no one contract in excess of $15,000 existed.
Even assuming there was a contract in excess of $15,000, defendant Cournoyer produced evidence of documents, all contracts, which expressly waived any right to lien the property. The mortgage does not expressly permit or prohibit the employment of such waivers. The jurisprudence of our state, however, recognizes their validity. "Liens may be lost in a number of ways: that is, by payment of the claim secured, by waiver expressly agreed to, or by waiver arising by implication from the facts and circumstances of the particular case." Wardlaw Brothers Garage, Inc. v. Thomas, 19 La.App. 241, 140 So. 108 (La. App. 2d Cir.1932); Babineaux v. Grisaffi, 180 So.2d 888 (La.App. 3d Cir.1965). Having obtained these lien waivers, Cournoyer cannot have violated the provisions of paragraph 6(d) of the mortgage contract.
Executive also attempted to show that the renovations which were done without its consent constituted a "demolition of" and "removal of" the building. It appears that Executive is principally concerned with what the condition of the interior of the building would be in the event of Cournoyer's default. Testimony elicited by Executive indicated that the building was in such a state of disrepair that hundreds of thousands of dollars would have to be spent to finish the renovations before the building could be sold. Extensive remodeling was done to the building in order to comply with city code requirements, to increase the rental value of the office space, and to accommodate the needs of the tenants. Among the various things removed from the building were ceiling tiles, outdated electrical wires and outdated plumbing fixtures, all of which were replaced with new equipment. Additional testimony revealed that after the renovations were done, the rental value of the office space increased from $5.50 per square foot to $15 per square foot. All of the witnesses testified that certain renovations were necessary in order to meet the needs of a particular tenant. These changes consisted of moving partition walls to increase or decrease the amount of space or changing the office configuration.
The specific language of the contract convinces us there was no default. The clause refers to "actual or threatened addition to, demolition of, or removal of the building and/or improvement off of the property." In general, an "addition" denotes a structure which is physically attached to or connected with the building itself. Within the lien law, an addition "must occupy ground without the limits of the building to which it constitutes an addition, so that the lien shall be upon the building formed by the addition and the land upon which it stands." Blacks' Law Dictionary, 4th ed. Moreover, an alteration in a former building, by adding to its *328 height, or to its depth, or to the extent of its interior accommodations, is merely an "alteration", and not an "addition." By these definitions then, there was no addition to the building.
Nor do we find a "demolition" of the building. In everyday use, "demolish" means to destroy totally. Clearly, defendant Cournoyer did not totally destroy the building or commence the work of total destruction.
There was also no "removal of the building off of the property." The building was neither moved nor was its position or location changed. The only parts of the building removed from the property were trash and debris which accumulated during the renovation.
The demolition provisions of the mortgage speak about demolition or removal of "the building and/or improvement off of the property." The work in the building involved merely repairing or replacing what was old and worn with new materials. Old plumbing was replaced with a new plumbing system, old electrical wires were replaced with new wires, other repairs were done to ceiling tiles and plastered walls. In order to replace old electrical wires, walls had to be torn but these were repaired or replaced once the electrical work was done.
There was testimony that work was done in order for the building to meet the requirements of the city code. Exactly which renovations were done for this purpose was never shown at trial. We cannot assume all the work was done to comply with the code requirements. However, when looking at the renovations which were done, we find that they did not constitute a removal of an "improvement off of the property" which would violate the mortgage.
Many hours were spent in negotiating the act of credit sale and the mortgage. Clearly, Executive wants to protect its interest in and the value of the building. A suit for executory process in anticipation of default, however, is not the proper method to protect its interest. Executive could have prevented Cournoyer's conduct by expressly providing in its mortgage contract that any type of renovation which would give rise to any contract in excess of $15,000 would be prohibited. They did not. The court can only give effect to the contract entered by the parties; it cannot rewrite the contract for them.
There was no error on the part of the trial court in finding that the actions by Cournoyer did not constitute a default. In addition, the procedures necessary to obtain an injunction to arrest executory process were properly followed and the issuance of the injunction was well-founded.
For the foregoing reasons, the judgment of the trial court is hereby affirmed. The appellant is to pay all costs.
AFFIRMED.
NOTES
[1] "6. That, in the event the purchaser should violate any of the conditions of this act, or should fail to perform promptly any obligation herein set forth or, upon the happening of any one or more of the events or conditions hereinbelow set forth, the mortgagee(s) may, at its option, without demand, notice or putting in default, declare the note or obligation immediately due, exigible and payable together with interest, costs, attorney's fees, advances and all expenses and other charges: ...

(d) Upon the entering into a contract or agreement in excess of $15,000.00 by purchaser, his heirs, or assigns, either oral or written, recorded or unrecorded, in excess whereby any lien, privilege, mortgage, or other encumbrance in favor of anyone furnishing labor or materials, may be recorded against the property herein described, or in case of the actual or threatened addition to, demolition of, or removal of the building and/or improvement off of the property without the written consent of the mortgagee(s)."
[2] The alleged set-off arose out of Executive's warranty to Cournoyer that the general repair and maintenance expenses for the building during the calendar year 1978 were $6,755.13, and in the event an audit revealed the expenses to be in excess of that sum, then such excess, multiplied by ten, would be subtracted from the principal balance of the vendor's lien note, and any interest paid on that amount by which the principal is reduced would be credited against the interest to accure. Cournoyer claims that an audit revealed the maintenance expenses exceeded the warranted amount by $13,550.67.