United States Court of Appeals
Fifth Circuit

**F I L E D**

December 30, 2004

Charles R. Fulbruge III
Clerk

**REVISED JANUARY 24, 2005**

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-30183

SHAW CONSTRUCTORS, INC.,

Plaintiff-Appellant, Cross-Appellee,

VERSUS

ICF KAISER ENGINEERS, INC., ET AL.,

Defendants,

PCS NITROGEN FERTILIZER, L.P.

Defendant-Appellee, Cross-Appellant

Appeal from the United States District Court
For the Middle District of Louisiana

Before HIGGINBOTHAM, GARZA and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

This is an action based on the Louisiana Private Works Act
that requires the interpretation and application of the Louisiana
Civil Code articles in the chapters on Third Party Beneficiary and

1

Dissolution of Contracts.

A subcontractor performed its part of the work in constructing a $38 million Nitric Acid Facility for the owner of an industrial plant. In the subcontract with the general contractor, the subcontractor "agrees to and does waive" its right to file claims or liens against the owner's property. When the general contractor materially breached its primary obligation to pay the subcontractor the $5.3 million balance due for work on the owner's facility, the subcontractor filed claims and privileges or liens against the owner's property and brought suit against the owner under the Louisiana Private Works Act ("LPWA").[1] The owner filed a counter-claim, as third party beneficiary of the subcontract's lien waiver provision, seeking the enforcement of that provision, the cancellation of the claims and liens filed, and the award of damages and attorneys' fees. Applying Louisiana law in this diversity jurisdiction suit, we reverse the magistrate judge's holding that the subcontractor may not raise against the owner-third party beneficiary's demand the defenses it could have raised against the general contractor. Instead, we enter summary judgment sustaining the subcontractor's right to regard the subcontract as dissolved and the parties restored to their pre-contract positions

---

[1] La. R.S. § 9:4801, *et seq.* The subcontractor also brought suit against the general contractor, but these parties entered into a "Compromise Agreement," described more fully herein, reserving the subcontractor's rights against the owner.

when it became evident that the general contractor would not perform and had materially breached the subcontract.[2] Because dissolution and restoration operate retroactively to have effect as of the day the subcontract was entered into, and because the subcontractor did not explicitly waive its right to dissolution, the dissolved lien waiver provision of the rescinded subcontract could not be invoked to preempt or bar the exercise of the subcontractor's right to file claims and liens under the LPWA and seek to enforce them against the owner and its property.

## I.

On September 17, 1997, PCS Nitrogen Fertilizer, L.P. ("PCS"), owner of an industrial plant near Geismar, Louisiana, entered into a $38 million contract ("Prime Contract") with general contractor ICF Kaiser Engineering, Inc. ("Kaiser") for design and construction of a structure named the "1265 STPD NITRIC ACID FACILITY." The facility was built at the PCS plant straddling the boundary line between Iberville and Ascension Parishes.

Under the Prime Contract, PCS authorized Kaiser to subcontract portions of the work but specified that Kaiser would be responsible for the actions of subcontractors. The Prime Contract also provided that Kaiser would pay and discharge any lien that may be filed, and indemnify, defend, and hold PCS harmless from liens on

---

[2]*Id.* arts. 2013, 2016, & 2018.

3

its property.[3]   In addition, the Prime Contract provided that Kaiser would reimburse PCS whatever costs PCS incurred in discharging any liens.  Although the LPWA authorized PCS to protect itself against personal liability and privileges on its property under the Act by filing a notice of the contract and having Kaiser file a bond to protect subcontractors,[4] PCS chose not to do so.

In January 1998, Kaiser subcontracted a portion of its work to Shaw Constructors, Inc. ("Shaw").[5]   The subcontract states that Shaw agrees to provide labor, equipment, materials, and other construction services for the 1265 STPD NITRIC ACID FACILITY project and "agrees to and does waive its right to file any mechanic's lien or claims of any sort or kind against [PCS's] premises or any part thereof."[6]   In exchange, Kaiser obligated

---

[3] The common law term "lien" and civil law term "privilege" will be used interchangeably throughout this opinion because the parties spoke of the terms as equivalent and as the differences between the terms are not relevant to our analysis.

[4] La. R.S. § 9:4802(C).

[5] PCS was not a party to the subcontract, and there was no privity between PCS and Shaw.  However, the subcontract between Kaiser and Shaw referred to the Prime Contract between PCS and Kaiser, referred to PCS as "owner," and stated that "Subcontractor hereby agrees to and does waive its right to file any mechanic's lien or claims of any sort or kind against owner's premises or any part thereof."

[6] The full text of the lien waiver clause provides:

> Subcontractor hereby agrees to and does waive its right to file any mechanic's lien or claims of any sort or kind against owner's premises or any part thereof. Subcontractor further agrees to obtain a written waiver

4

itself in the subcontract to make payments to Shaw, based on its monthly progress, within 45 days after receiving each of Shaw's invoices.

As Shaw's work progressed, Kaiser failed to make timely payments, and Shaw contemplated stopping work. Instead, on January 12, 1999, Shaw agreed to continue work in exchange for Kaiser making specifically scheduled payments and obtaining a payment bond for the remainder of the work on the project.

Nevertheless, Kaiser still failed to perform its obligation under the subcontract to pay for Shaw's work. Instead, on January 26, 1999, Kaiser notified Shaw that it could or would not make any further payment under the subcontract. Shaw, which essentially had completed its work, wound up its portion of the project on February 1, 1999. At the time of Kaiser's complete, material breach of the subcontract, it had failed to pay Shaw over $5.2 million for Shaw's construction work on the PCS nitric acid facility. On January 27, 1999, Shaw filed and recorded statements of claim and privilege asserting its rights under the LPWA against PCS and its property

---

of the right to file any mechanic's liens or claims of any sort or kind against Owner's premises or any part thereof from any and all subcontractors, suppliers and materialmen at the time any subcontracts or purchase orders are issued in connection with the work. In accordance with Article 25E of Exhibit "C", General Conditions for Subcontract, a "Release and Waiver of Lien" in the form of Appendix 1-A shall be executed by Subcontractor prior to release of each payment hereunder.

for Shaw's uncompensated work on the PCS facility.

On February 23, 1999, Shaw filed suit against PCS and Kaiser in state court in Iberville Parish. PCS and Kaiser removed the case to federal court. On April 8, 1999, Shaw and Kaiser entered into an agreement ("Compromise Agreement") that: (1) Kaiser would pay off $5,238,217.90 owed to Shaw for work on the PCS facility in 20 monthly installments; (2) a default judgment would be entered to that effect; (3) Shaw's liens on PCS's property would not be cancelled unless Kaiser filed a bond or other security in conformity with the requirements of the LPWA or furnished a $5,300,000 letter of credit; and (4) Shaw would not dismiss its claims and lawsuit against PCS unless Kaiser furnished replacement security or Kaiser's monthly installment payment obligations to Shaw were satisfied. Pursuant to the Compromise Agreement, Kaiser confessed to the allegations in Shaw's petition in its Answer and Confession of Judgment, admitting its default under the subcontract, its debt to Shaw, and the validity of Shaw's claim and privilege against PCS. PCS did not participate in the negotiations and agreements between Shaw and Kaiser, and Shaw reserved all of its rights against PCS. After a default judgment was entered, Kaiser made installment payments to Shaw totaling $3,201,133.21, but never provided replacement security. Thereafter, Kaiser defaulted on the remaining amount, leaving an unpaid principal balance of $2,037,084.77 due Shaw. On June 9, 2000, Kaiser filed

6

a petition in bankruptcy. On October 20, 2000 PCS demanded that, within ten days thereof, Shaw cancel the claim, privilege or lien and dismiss this lawsuit against PCS with prejudice, and on October 26, 2000 Shaw refused.

After the foregoing events, Shaw moved for partial summary judgment on liability only to the effect that, under the LPWA, PCS was personally liable and its nitric acid facility was subject to a privilege for Shaw's uncompensated work on the project. PCS moved for partial summary judgment dismissing Shaw's demands and cancelling Shaw's statements of claim and privilege filed on PCS's property. The parties consented to adjudication before a magistrate judge. On August 3, 2001, the magistrate judge ruled in favor of PCS on both of the cross-motions for summary judgment, dismissing Shaw's claims and ordering Shaw's lien removed from the public records. Thereafter, Shaw and PCS filed a second set of motions for summary judgment concerning attorneys' fees and damages. On December 21, 2001, the magistrate granted summary judgment in favor of PCS and awarded it $61,614.68 in attorneys' fees and damages under La. R.S. § 9:4833 of the LPWA. Both Shaw and PCS appealed.

Shaw argues that the magistrate judge erred by holding that PCS was a third party beneficiary of the subcontract and therefore able to demand specific enforcement of Shaw's obligation to comply with the lien waiver provision. Alternatively, Shaw charges that,

7

if PCS was a third party beneficiary, under Louisiana Civil Code article 1982 Shaw had the right to raise against PCS, as third party beneficiary, defenses based on the contract that it could have raised against Kaiser, had Kaiser made the same demand against Shaw.  Specifically, Shaw contends that, when Kaiser materially breached the subcontract, Shaw had the right to refuse to perform its file-no-lien obligation, to employ all rights and defenses against PCS that it may have raised against Kaiser, and to enforce its claim and privilege or lien against PCS and its property under the LPWA.

PCS argues that the magistrate judge correctly ruled that Shaw could not raise against PCS the defenses it could have raised against Kaiser, and that, in any event, Kaiser's material breach of the subcontract had no effect upon the lien waiver provision of the subcontract.  PCS contends that the magistrate judge correctly held that it may as third party beneficiary enforce the lien waiver provision against Shaw, that Shaw's claim and privilege or lien therefore were filed in violation of the lien waiver provision, that Shaw's claim and privilege or lien were improperly filed under the LPWA for the same reason and others, that Shaw therefore cannot hold PCS personally liable or enforce a lien or privilege against PCS's property under the LPWA, that Shaw did not have reasonable cause to refuse to cancel its lien upon PCS's demand, and that Shaw should be taxed with attorney's fees and damages pursuant to the

8

LPWA.

Both Shaw and PCS appealed.

We review rulings on motions for summary judgment *de novo*, applying the same standards prescribed for use by the district court.[7] Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.[8] If there is no genuine issue and one of the parties is entitled to prevail as a matter of law, the court may render summary judgment.[9] Louisiana substantive law applies to

---

[7] *See Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000).

[8] 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §2720 (3d ed. 1998)("The court must rule on each party's motion [for summary judgment] on an individual and separate basis, determining for each side, whether a judgment may be entered in accordance with the Rule 56 standard.")

[9] 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE §2720 (3d ed. 1998)("But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment.") *Vela v. City of Houston,* 276 F.3d 659, 671 (5th Cir. 2001)(In situations involving cross-motions for summary judgment and upon finding no genuine issues of material fact, this court regularly reverses grants of summary judgment and enters judgment for the opposite party.). *See also Owsley v. San Antonio Independent School Dist.,* 187 F.3d 521, 527 (5th Cir. 1999)(reversing and rendering judgment for the adverse party on cross motions for summary judgment.); *Ehrlicher v. State Farm Ins. Co.* 171 F.3d 212,(5th Cir,. 1999)(reversing and rendering judgment for the adverse party on cross motions for summary judgment.); *Gilley v. Protective Life Ins. Co.* 17 F.3d 775, (5th Cir. 1994)(reversing and rendering judgment for the adverse party on cross motions for summary judgment.)

9

this diversity jurisdiction case.[10]

## II.

The magistrate judge correctly interpreted the subcontract between Kaiser and Shaw as stipulating a benefit for PCS as a third party beneficiary, but it incorrectly concluded that Shaw could not raise against PCS the defenses on the contract that it could have raised against Kaiser.

As the magistrate judge, in concluding that PCS was a third party beneficiary of the Kaiser-Shaw subcontract's lien waiver provision, stated:

> Shaw expressly agreed to waive its right to file any liens or claims of any sort against the owner's premises. The subcontract clearly identifies PCS as the owner.... The preamble of the subcontract... stated that the subcontract was made pursuant to the contract between PCS and Kaiser.... Because of Kaiser's agreement in the prime contract, the subcontract lien waiver provision benefitted both Kaiser and PCS. This arrangement does not render the benefit which Shaw unequivocally conferred upon PCS by agreeing to the condition any less apparent or direct.[11]

Nor do we see any error in the magistrate judge's conclusion that PCS adequately manifested its intention to avail itself of the benefit before any attempt was made by Kaiser and Shaw to revoke

---

[10] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[11] Aug. 3, 2001 Magistrate Judge Opinion, at 13-15 (citing *Merco Mfg., Inc. v. J.P. Michael Const. Co.*, 372 F.Supp. 967, 974 (W.D.La. 1974)(footnote omitted)).

the stipulation.[12]

The magistrate judge erred, however, in concluding that Shaw could not raise against PCS the defenses based on the subcontract that it had against Kaiser. Louisiana Civil Code Article 1981 provides, in pertinent part, that "[t]he stipulation gives the third party beneficiary the right to demand performance from the promisor."[13] That right is qualified, however, by Louisiana Civil Code Article 1982, which states that "[t]he promisor may raise against the beneficiary such defenses based on the contract as he may have raised against the stipulator."[14] Thus, in the present

---

[12] *See* La. Civil Code arts. 1978-1979. PCS filed an affidavit by its senior counsel that he had informed Kaiser as early as February 26, 1999 and on numerous other occasions that Kaiser should take no action which would waive or limit PCS's third party beneficiary rights. Shaw offered no evidence to refute these expressions by PCS that implied its intention to avail itself of the benefit. The events that Shaw contends revoked the stipulation occurred after February 1999. "Once the third party has manifested his intention to avail himself of the benefit, the parties may not dissolve the contract by mutual consent without the beneficiary's agreement." *Id.* art. 1978. "Under this Article, the beneficiary's intention to accept the benefit may be made known in any manner, even implied." *Id.* art. 1978 rev. cmt. b. "The stipulation may be revoked only by the stipulator and only before the third party has manifested his intention of availing himself of the benefit." *Id.* art. 1979.

[13] *Id.* art. 1981.

[14] *Id.* art. 1982. Louisiana Civil Code Article 1982 is similar to the prevailing rule in other jurisdictions. *See* RESTATEMENT (SECOND) OF CONTRACTS § 309(2) (1981)("If a contract [creating the promisor's duty to the intended beneficiary] ceases to be binding in whole or in part because of... present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified."); *Id.* cmt.b. ("Thus a

11

case, Shaw, the promisor, had the right to raise against PCS, the beneficiary, any defense based on the subcontract that Shaw could have raised against Kaiser, the stipulator or promisee.[15]

The magistrate judge concluded that interpreting Article 1982 to allow Shaw to raise against PCS any defense based on the contract that Shaw could have raised against Kaiser, "would negate the right of PCS under articles 1978 and 1981 to accept and demand

---

failure of the promisee to perform a return promise ordinarily discharges the promisor's duty to a beneficiary to the same extent that it discharges his duty to the promisee."); 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 37:55 (4th ed. 2000) (collecting authorities, e.g., *Nauru Phosphate Royalties, Inc. v. Drago Daic Interests, Inc.*,138 F.3d 160, 166 (5th Cir. 1998)).

[15] Article 1982 was adopted in 1984 to "express[] a conclusion reached by the Louisiana jurisprudence." La. Civ. Code art. 1982 rev. cmt. (citing *Union Bank of Louisiana v. Bowman*, 9 La. Ann. 195 (1845); *Tiernan v. Martin*, 2 Rob. 523 (1842)); *see also* J. Denson Smith, *Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui*, 11 TUL. L. REV. 18, 57 (1936-37)("[T]he promisor may oppose the suit of the beneficiary any defenses arising from the contract which are available to him as against the promisee such as that the contract was ineffective because ... there was a failure of consideration, or of a condition upon which performance of the promise was made to depend." (citing *Bowman*, 9 La. Ann. at 195, *Brandon v. Hughes*, 22 La. Ann. 360 (1980); *Janney v. Ober*, 28 La. Ann. 281 (1876); *Tennent v. Caffrey*, 129 So. 128 (1930))); 2 MARCEL PLANIOL, TREATISE ON THE CIVIL LAW, No. 1264(5) (La. State L. Inst. Transl. 1959) ("*Failure by the Stipulator to Execute his Obligations*. If the stipulator has not carried out his own obligations to the promisor, the latter is discharged from his obligation to the third person.... [I]t is in conformity to the apparent will of the parties to presume that the promisor is not obligated to the third person except in consideration of the obligations towards him.").

12

performance of the stipulation pour autri."[16] We cannot agree. Article 1982 only subjects the beneficiary's demand for performance from the promisor to the same contractual defenses which would apply if the stipulator demanded performance under the contract. Article 1982 would have no application to a case in which the promisor has no defense based on the contract against the stipulator or promisee. Thus, Article 1982 does not "negate" or nullify the third party beneficiary's right to avail himself of the benefit and demand performance from the promisor under Articles 1978 and 1981. In sum, when we interpret Article 1982 in reference to the other code articles on the same subject,[17] as we think the Louisiana Supreme Court would, we conclude that the beneficiary's

---

[16] The magistrate judge's reasoning seems to be based on the incorrect assumption that the beneficiary's right must be considered as either an absolute right or a nullity. The court's full statement provides:

> Article 1981 grants both the stipulator and the third party beneficiary the right to demand performance. Under the second part of the article, if Kaiser demanded performance it would be doing so not for itself but for PCS. By exercising its equal right under article 1981 to claim the benefit of the stipulation, PCS cannot be exercising greater or better rights than Kaiser. Interpreting article 1982 as suggested by Shaw in the context of this case, would negate the right of PCS under articles 1978 and 1981 to accept and demand performance of the *stipulation pour autri.*

Aug. 3, 2001 Magistrate Judge Opinion, at 19 (footnote omitted).

[17] *See* La. Civ. Code art. 13 ("Laws on the same subject matter must be interpreted in reference to each other.")

13

right is not absolute or independent.  Inherently, it is a right derived solely from the third party beneficiary contract between the promisor and the stipulator or promisee.  Unsurprisingly, then, the Code provides in Article 1982 that the beneficiary's right is amenable to the same defenses based on that contract that the promisor may use against the stipulator or promisee.

In comparison, this contextual interpretation of Article 1982 is consistent with the prevailing general rule recognized by other American jurisdictions.[18]  "As with any contract, the promisor's and promisee's substantive purpose in entering a third party beneficiary contract is the performance of the mutual promises.  If the promisee fails to perform, the promisor has not received the agreed consideration.  Under these circumstances, it is manifestly unjust to allow a mere donee to enforce the promise.  Even creditor beneficiaries are not entitled to any greater right than their debtor possessed."[19]  This reading of Article 1982 is also in accord with Marcel Planiol's treatise on the civil law, which states that "[i]f the stipulator has not carried out his own obligations to the promisor, the latter is discharged from his obligation to the third

---

[18] *See supra* note 12.

[19] 13 LORD, WILLISTON ON CONTRACTS, *supra* note 12, § 37:56. (internal footnotes omitted).

person."[20]  Planiol maintained this view, despite disagreement from "[c]ertain authors" at the time, because "it is in conformity to the apparent will of the parties to presume that the promisor is not obligated to the third person except in consideration of the obligations towards him."[21]

For these reasons, we conclude that the Louisiana high court would follow the plain words of Article 1982 and allow Shaw to raise against PCS such defenses based on the subcontract as it may have raised against Kaiser.  Accordingly, we turn to an examination of the Civil Code rights and defenses that Shaw argues it could have raised against Kaiser had Kaiser demanded that Shaw perform its obligation arising from the subcontract's waiver of right to file liens provision.

## III.

Shaw's most relevant argument is that it was entitled, because of Kaiser's material breach of the commutative subcontract between them, to rescind the contract and invoke a non-breaching party's right under La. C.C. art. 2022 to refuse to perform its own obligations under the contract.  Consequently, Shaw further

---

[20] 2 PLANIOL, TREATISE ON THE CIVIL LAW, *supra* note 13, No. 1264(5); *see also* Smith, *supra* note 13, at 57 (citing *Bowman*, 9 La. Ann. at 195, *Brandon v. Hughes*, 22 La. Ann. 360 (1980); *Janney v. Ober*, 28 La. Ann. 281 (1876); *Tennent v. Caffrey*, 129 So. 128 (1930)).

[21] 2 PLANIOL, TREATISE ON THE CIVIL LAW, *supra* note 13, No. 1264(5).

contends, it was entitled to refuse to perform its obligation not to file liens even as to PCS, the third party beneficiary, because Civil Code article provides that "[t]he promisor [Shaw] may raise against the beneficiary [PCS] such defenses based on the contract as he may have raised against the stipulator [Kaiser]." For the reasons now assigned, we conclude that Shaw's arguments have merit.

## A.

The subcontract between Kaiser and Shaw was a commutative contract making "the performance of the obligation of each party ... correlative to the performance of the other,"[22] as well as a bilateral or synallagmatic contract in which "the parties obligate themselves reciprocally, so that the obligation of each party is correlative to the obligation of the other."[23]

---

[22] La. Civ. Code art. 1911and rev. cmt.(b)&(c); *see Morris v. Homco International, Inc.*, 853 F.2d 337, 342 (5th Cir. 1988); SAÚL LITVINOFF, 5 CIV. L. TREATISE § 15.12 (2d ed. 2001); ALAIN A. LEVASSEUR, PRECIS IN CONVENTIONAL OBLIGATIONS: A CIVIL CODE ANALYSIS 24 (Michie, 1980)("A contract is commutative when a party considers that what he gives or does is the equivalent of what it will receive from the other party.")

[23] La. Civ. Code art. 1908 and rev. cmt.(b)(citing 1 SAÚL LITVINOFF, OBLIGATIONS 396-400 (1969) ; *see Morris*, 853 F.2d at 342; *cf*.., *Stockstill v. Byrd*, 132 La. 404, 407, 61 So. 446, 447 (1913)("The courts at the present day incline strongly against the construction of promises as independent; and, in the absence of clear language to the contrary, promises which form the consideration for each other will be held to be concurrent or dependent, and not independent, so that a failure of one party to perform will discharge the other, [and] so that one cannot maintain an action against the other without showing the performance or tender of performance on his part."); *Accord*: 15 LORD, WILLISTON ON CONTRACTS, *supra* note 14, § 44:5 ("The modern rule

16

"Either party to a commutative contract may refuse to perform his obligation if the other has failed to perform or does not offer to perform his own at the same time, if the performances are due simultaneously."[24]  Therefore, when Kaiser failed to perform its obligation under the subcontract of making payments for work done by Shaw, Shaw had the right to refuse to perform its obligation

adopts a presumption that mutual promises in a contract are dependent and are to be so regarded, whenever possible."); §44:11 ("Under the modern view, promises in a contract are generally presumed to be dependent unless a contrary intent is shown.")(also quoting RESTATEMENT (Second) of Contracts § 232); *Foley Lumber Industries, Inc. v. Buckeye Cellulose Corp.*, 286 F.2d 697, *700 (5th Cir. 1961)("Although many nice distinctions are to be found in the books upon the question, whether the covenants or promises of the respective parties to the contract, are to be considered independent or dependent; yet it is evident, the inclination of courts has strongly favored the latter construction, as being obviously the most just." (quoting *Bank of Columbia v. Hagner*, 1828, 1 Pet. 455, 465, 26 U.S. 455)).

[24]La. Civ. Code art. 2022 and rev. cmt.(b)(citing 2 SAÚL LITVINOFF, OBLIGATIONS 426-434, 501-506 (1975)).  The Second Restatement of Contracts expresses a similar principle in the introduction to Chapter 10 on Performance and Nonperformance:

> The most important and complex of the rules stated in this Chapter apply to the most significant type of contract, that in which the parties have exchanged promises in the expectation that there will be a subsequent exchange of performances....
> When a party fails to receive the performance that he expects,....[i]t is, therefore generally fairer to give the injured party, to the extent that it is possible, the right to suspend his own performance and ultimately to refuse it and, if the other party's nonperformance is not justified, to claim damages for total breach of contract.

RESTATEMENT (SECOND) OF CONTRACTS ch. 10 intro. note, at 193-94.

17

under the subcontract.[25]

More important, when it became evident that Kaiser would not perform its subcontract obligation, Shaw had the right to consider the subcontract and all of its provisions dissolved[26] and the

---

[25] Article 2022 gives "general formulation to the *exceptio non adimpleti contractus* (defense of nonperformance)." La. Civ. Code art. 2022 rev. cmt. b. As Planiol explained, the "exception *non adimpleti contractus*...is interposed when one of the parties is claiming of the other the performance of his engagement, without himself offering what he owes; such party is nonsuited by the filing of the above mentioned exception." 2 PLANIOL, TREATISE ON THE CIVIL LAW, *supra* note 13, No. 949(2). "[W]hen two persons obligate themselves the one to the other, each one of them gives only but conditional consent to the act; one obligates himself because the other also obligates himself towards him. The reciprocity of the obligations necessarily implies performance and this concept leads, on the one hand, to a 'give and take' system of performance or to the *exceptio non adempleti contractus*..., and on the other hand, to the right to demand the resolution when it was too late to oppose the said exception because the obligation was already performed." *Id.* No. 1309.

[26] La. Civ. Code art. 2016 ("[W]hen it is evident that the obligor will not perform, the obligee may regard the contract as dissolved without any notice to the obligor."); *id.* rev. cmt. ("Louisiana courts have established that a putting in default is not necessary when the obligor has communicated an intention not to perform, or in a situation where time is of the essence (citing *Allen v. Steers*, 2 So. 199 (1887); *Abels v. Glover*, 15 La. Ann.247(1860); *Kinsell & Locke, Inc. V. Kohlman*, 126 So. 257 (La. App. Orl. 1930))); *id.* art. 2013 ("When the obligor fails to perform, the obligee has a right to the judicial dissolution of the contract or, according to the circumstances, to regard the contract as dissolved.").
Planiol explained some of the principles underlying the right of resolution or dissolution as follows:

Art. 1184 in establishing the action of resolution, indicates in the following terms the circumstances which gives rise to it: "in case one of the contracting parties does not comply with his engagements." The law is not precise as to the nature of the cause which

18

parties restored to the situation that existed before the subcontract was made.[27]    Thus, the "dissolution operates

> prevents him from complying.... The text makes no
> distinction, and the jurisprudence therefore concludes,
> as do the majority of the authors, that there is an
> action in resolution, whatever is the cause for which
> the adverse party fails to comply with his
> engagements."

2 PLANIOL, TREATISE ON THE CIVIL LAW, *supra* note 13, No. 1313
(citations omitted).

> The action in resolution established by Art. 1184 is
> given only to the party who is ready to perform his
> engagement or who has already performed it.  The other
> party has no right to the resolutions of the
> contract....  It is natural, therefore, that the party
> at fault should suffer the resolution by the will of
> the other, without being able to demand it himself.

*Id.* No. 1314 (citations omitted).

> The party entitled to the action of resolution is not
> limited to this means only; he has the choice of
> resolving the contract or of demanding its performance
> if he prefers it, provided that the fault of the debtor
> has not rendered such performance impossible.

*Id.* No. 1315.

> The resolution of the contract is not sufficient in
> itself to completely satisfy the plaintiff.  His
> recovering or keeping the object of his obligation
> often does not give him the contemplated profits he
> would have obtained upon the effective performance of
> the contract.  To compensate him for the damage
> suffered by this loss of profits, he is entitled to
> damages to be fixed by the judge.

*Id.* No. 1317.

[27] La. Civ. Code art. 2018 ("Upon dissolution of a contract,
the parties shall be restored to the situation that existed
before the contract was made."); *see Sliman v. McBee*, 311 So. 2d

retroactively,"[28] "has a retrospective effect to the day that the engagement was contracted,"[29] and "the parties are restored to the situation in which they would be if the contract had not been entered into."[30]

Moreover, under the Louisiana Supreme Court's decisions, in order for a party to waive his right to dissolve a commutative contract upon the other party's material breach, the non-breaching party must express therein his intent to relinquish that right in words that make specific reference to the action to dissolve. In the leading case of *Sliman v. McBee*,[31] Mrs. Sliman sold immovable

---

248, 252 (La. 1975)("The effect [of dissolution] is to place all parties in the same position they occupied prior to the sale."); *Louis Werner Saw Mill Co. v. White*, 17 So. 2d 264, 268 (La. 1944)("The effect of the dissolution is to place matters in the same state as though the obligation had not existed."); *U.S. v. Maniscalco*, 523 F.Supp. 1338, 1342(E.D.La. 1981)("The effect of the resolutory condition is codified in Article 2130 which states that obligations are "extinguished" by the effect of the dissolving condition.").

[28] 2 A.N. YIANNOPOULOS, LA. CIVIL LAW TREATISE: PROPERTY § 233, at 469 (4th ed. 2001).

[29] *Liquidators of Prudential Sav. & Homestead Soc. v. Langermann*, 100 So. 55, 61 (La. 1924); *McKenzie v. Bacon*, 5 So. 640 (La. 1889).

[30] *Hood v. Southern Prod. Co.*, 19 So. 2d 336, 341 (La. 1944)(dictum); *Sliman v. McBee*, 311 So. 2d 248, 252 (La. 1975)("[T]he seller may sue for dissolution of the sale and return of the property. The effect is to place all parties in the same position they occupied prior to the sale." (citations omitted)).

[31] 311 So. 2d 248 (1975).

property to the McBees, her daughter and son-in-law.[32]  In the act of sale, Mrs. Sliman waived her vendor's privilege stating that "no lien shall exist on the lots here sold securing payment" of the notes given by the McBees as part of the purchase price.[33]  The McBees defaulted and Mrs. Sliman brought suit for dissolution of the sale for nonpayment.[34]  The trial and appeals courts both decided against Mrs. Sliman, the latter holding that she had waived not only her vendor's lien but also her right to dissolution of the sale for nonpayment.[35]  The Louisiana Supreme Court reversed, holding that (1) a "dissolving, or resolutory, condition is implied in all commutative contracts and takes effect upon the failure of either party to comply with his engagement and the demand for dissolution by the aggrieved party;"[36] (2) the right of dissolution is an independent, substantive remedy in no way dependent upon the existence of a security device such as a mortgage or a privilege;[37]

---

[32] *Id.* at 249.

[33] *Id.* at 250.

[34] *Id.* at 251.

[35] *Id.* at 250-51.

[36] *Id.* at 252 (citing and quoting La. Civ. Code art. 2045 (1870): "The dissolving condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed.")

[37] *Id.*  The right to dissolution arises from the contract itself.  La. Civ. Code art. 2013 comment (b).

21

(3) in order to waive the separate and independent right of dissolution the non-breaching party must "express her intent to relinquish that right in words that make specific reference to the action to dissolve as distinguished from the action to enforce the contract;"[38] (4) the language in the act of sale does not constitute a waiver by Mrs. Sliman of her right to rescind the sale upon the McBees' default in payment of the purchase price.[39] "The fact that the vendor has lost, or not preserved, his vendor's lien, or mortgage, presents no sort of obstacle to the exercise of this right of resolution."[40]

The already strong right to dissolution was preserved and strengthened by the 1984 revision of Title III of Book III of the Louisiana Civil Code of 1879, "Of Obligations." Article 2013 "reproduces the substance of C.C. Arts. 2046 and 2047 (1870)and also provides that, according to the circumstances, the obligee has a right to regard the contract as dissolved, a right recognized by the Louisiana jurisprudence in numerous decisions."[41] Further,

---

[38] *Id.*

[39] *Id.* at 253.

[40] *Id.* at 253 n.8 (quoting *Stevenson v. Brown*, 32 La. Ann. 461, 463 (1880)).

[41] La. Civ. Code art. 2013 rev. cmt. a (citations omitted). Article 2013 (1984) provides:
> When the obligor fails to perform, the obligee has a right to the judicial dissolution or the contract or, according to the circumstances, to regard the contract as dissolved. In either case, the obligee may recover

22

Under this Article, either party to a contract may seek dissolution upon the other's failure to perform. [T]his remedy is [no longer] predicated upon a resolutory condition implied in every commutative contract. This Article abandons both that rationale and that limitation, in accordance with modern doctrine. Nevertheless, <u>under this Article a party's right to dissolution because of the other party's failure to perform arises from the contract itself, and to that extent it can be said to be implied in it</u>, although not in the form of a resolutory condition.[42]

Louisiana Civil Code Article 2018, in part, provides that: "Upon dissolution of a contract, the parties shall be restored to the situation that existed before the contract was made."[43] "It expresses a principle that is implied in C.C. Arts. 1901, 1903, 2045, and 2046 (1870)."[44]

Thus, we conclude, as we think the Louisiana Supreme Court would, that the subcontract provision by which Shaw "agrees to and does waive its right to file any mechanic's lien or claims" against PCS's property, does not constitute a waiver by Shaw of its dissolution rights because it does not express Shaw's intent to relinquish the right to dissolution "in words that make specific

---

damages.
     In an action involving judicial dissolution, the obligor who failed to perform may be granted, according to the circumstances, an additional time to perform.

[42] *Id.* rev. cmt. b (citations omitted)(emphasis added).

[43] *Id.* art. 2018.

[44] La. Civ. Code art. 2018 rev. cmt. a.

23

reference to the action to dissolve."[45]   Further, that waiver provision is simply too vague, indefinite, and uncertain to indicate that the parties' intended for it to supersede all of Shaw's rights against Kaiser regardless of Kaiser's material failure of performance.   For these reasons, Shaw's right of dissolution upon Kaiser's material breach was not affected by Shaw's agreement to waive the right to file liens and claims against PCS.

Accordingly, when Kaiser materially defaulted on its obligation of performance, Shaw had the right to regard the subcontract as having been dissolved. Upon its dissolution, the parties were restored to the situation that existed before the contract was made.[46]   Therefore, when PCS filed its counterclaim seeking, as third party beneficiary standing in Kaiser's shoes, to enforce the erstwhile lien waiver provision, it was not entitled to do so. That provision had been dissolved as part of the dissolved subcontract; and Shaw was free of any obligation created by the parties' agreement to the waiver provision because Shaw had been restored to the situation that existed before the subcontract. Consequently, after the dissolution and restoration Shaw had a right under the LPWA to file a claim and a privilege against PCS's property and to seek recovery from PCS personally for uncompensated

---

[45] *Sliman v. McBee*, 311 So.2d at 252.

[46] La. Civ. Code art. 2018 (1984).

24

work on PCS's nitric acid facility; when Shaw took these actions the subcontract and Shaw's obligations under it had been dissolved ab initio. Therefore, the dissolved lien waiver provision and any obligation created by it could not have any effect upon Shaw's ability to exercise its rights under the LPWA against PCS and its property.

In other words, PCS, whose right as a third party beneficiary can rise no higher than the right of Kaiser, its stipulator-promisee, is not entitled to enforce the lien waiver provision as if that obligation were separate and independent from the other obligations arising from the subcontract. PCS is amenable to Shaw's defense and right of dissolution just as Kaiser would have been if it had sought to enforce the lien waiver provision.

## B.

PCS argues that, despite Kaiser's material breach giving rise to Shaw's rights and defenses, the magistrate judge's ruling was correct and the lien waiver provision may still be enforced by PCS against Shaw because "'[A] mechanic's lien can be obtained only if there is a breach of contract and if ... a breach of contract nullifies a written waiver of lien, then there would be no way to effectively waive the right to a mechanic's lien.'"[47] PCS relies

---

[47] PCS Original Brief, at 28 (citing and quoting *Jankoviak v. Butcher*, 159 N.E.2d 377, 378 (Ill. App. 2d Dist. 1959)).

principally upon this rationale, which it quotes from the Illinois Court of Appeal's opinion in *Jankoviak v. Butcher,*[48] a 1959 decision applying the Illinois mechanics' lien statute to uphold a home builder's lien waiver in its contract after an owner refused to pay the home builder.

PCS's argument is not relevant, however, because it is based on Illinois rather than Louisiana law. In this diversity jurisdiction case, we must apply Louisiana law, and in resolving any issues of interpretation or application, we must decide as we think the Supreme Court of Louisiana would. For several reasons, we believe that the Louisiana high court would refuse to borrow and apply the Illinois court's interpretation of the Illinois mechanics' lien statute here as urged by PCS.

To borrow the rule of decision from an Illinois case would require a drastic departure from the civil law methodology followed by the Louisiana Supreme Court. In Louisiana, "[t]he sources of law are legislation and custom."[49] These authoritative or primary sources of law are to be "contrasted with persuasive or secondary sources of law, such as [Louisiana and other civil law] jurisprudence, doctrine, conventional usages, and equity, that may guide the court in reaching a decision in the absence of

---

[48] *Jankoviak*, 159 N.E.2d at 377-78.

[49] La. Civ. Code art. 1.

26

legislation and custom."[50]  "It is axiomatic that in Louisiana, courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes."[51]  "[O]ur ultimate '*Erie* guess' requires that we employ the appropriate Louisiana methodology to decide this issue the way that we believe the Supreme Court of Louisiana would decide it."[52]  We are convinced that the Louisiana high court would not depart from its usual civil law methods of examining first the primary sources of law applicable to the present case, the Louisiana Civil Code and the LPWA.  Therefore, we do not believe that the Louisiana high court would, in a case under the Civil Code or the LPWA, borrow and apply a rule of decision from an Illinois court's interpretation of the Illinois mechanics' lien law.  In addition, it is likely that no state supreme court would consider applying case law based on any

---

[50] *Id.* rev. cmt. b.  (citing A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW SYSTEM §§ 31, 32 (1977).

[51] *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 174 (5th Cir. 1999); *see also Smith v. Southern Holding, Inc.*, 839 So. 2d 5 (La. 2003); *Cole-Miers Post 3619 V.F.W. of DeRidder v. State, Dept. Of Rev. & Taxation, Office of Alcoholic Beverage Control*, 765 So. 2d 312 (La. 2000); Albert Tate, Jr., *Techniques of Judicial Interpretation in Louisiana*, 22 LA. L. REV. 727, 727-728 (1962)("[T]he primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts.... The Louisiana judge must, as stated, find primarily in legislative enactments the legal principles to be applied in deciding the case before him.").

[52] *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 197 (5th Cir. 2003).

27

other jurisdiction's mechanics' lien statute because of the notorious diversity of such laws among the states.[53]

In fact, the Illinois mechanic's lien statute is crucially different from the LPWA. The 1959 *Jankoviak* decision is inapposite Illinois jurisprudence because it was based on two features of the Illinois mechanics' lien statute that differ crucially from the LPWA. First, the Illinois court noted that the Illinois statute

---

[53] *See, e.g.,* UNIFORM CONSTRUCTION LIEN ACT prefatory note, 7 U.L.A. 2 (2002)("All states presently have mechanics' lien laws. Those laws present an extraordinarily varied approach, in substance, and in language, to the issues involved in mechanics' lien legislation. In fact, variation among the states may be greater in this area than in any other statutory area."); 53 AM. JUR. 2D *Mechanics' Liens* § 7("The mechanic's lien laws of the various states are notorious for the extent to which they vary from each other in their application and operation. The diversity in the mechanic's lien laws of the various states diminishes, and may often nullify, the value of a decision from one state as a precedent in another, and courts often reject the asserted authority of a decision from another jurisdiction, or regard it as being of little or no value"(footnotes omitted)); Ethan Glass, *Old Statutes Never Die ... Nor Do They Fade Away: A Proposal for Modernizing Mechanics' Lien Law By Federal Action*, 27 OHIO N.U. L. REV. 67 (2000)("State statutes create many different rules regarding what property can be impaired by a mechanics' lien, who is entitled to claim a mechanics' lien, how a mechanics' lien may be created, and what the result is of the creation of a mechanics' lien. The ongoing theme to remember is that there are fifty-two jurisdictions with fifty-two different laws.").

The variety in state lien laws is particularly evident with respect to the effect of lien waiver clauses on lien rights. *See* 8 LORD, WILLISTON ON CONTRACTS, *supra* note 12, § 19:58 ("There is a conflict in the cases as to the effect of a contractor's waiver in a building contract of his right, or that of subcontractors or materialman, to file mechanics' liens, with perhaps a majority of states refusing to permit such waivers, except upon or following payment."(footnote omitted)).

provided that "[i]f the legal effect of any contract between the owner and contractor is that no lien or claim may be filed or maintained by anyone, such provision shall be binding."[54]  Second, that court's decision was also based on the Illinois statutory requirement that a mechanic's lien could be obtained only if there was first a breach of contract.[55]

The LPWA does not make the breach of a contract indispensable to obtaining a lien, as the Illinois mechanics' lien law does. Under the LPWA, as soon as the work has been substantially completed or abandoned or the owner has filed a notice of termination, a subcontractor may file and obtain a lien, regardless of whether there has been a breach of contract.[56]  Thus, under the

---

[54] *Jankoviak*, 159 N.E.2d at 378.

[55] *Id.*  The Illinois statute may have been anomalous and contrary to a basic principle of contract law. "[I]t is essential to waiver that the right allegedly waived exist at the time of the waiver; a party may not waive any right it does not yet have. After a contract has been made, on the other hand, the right to performance under the contract may generally be waived either before or after  the time when performance is due."  13 LORD, WILLISTON ON CONTRACTS, *supra* note 12, § 39.10 (footnotes omitted); *see also* 31 C.J.S. *Estoppel* § 75 ("[A] waiver implies and requires the existence of the right in question at the time of the alleged waiver; there can be no waiver of a right before it exists, before a person is in a position to assert it, or after it has been lost."); 28 AM. JUR. 2D *Estoppel* § 201 ("To constitute a waiver, the right or privilege claimed to have been waived must generally have been in existence at the time of the purported waiver.  So, a person cannot waive a right before he or she is in a position to assert it.").

[56] La. R.S. § 9:4822(C).

LPWA, the subcontractor is not forced by law to wait until the general contractor actually defaults before filing a claim or privilege, as he would have to do under the Illinois statute. Moreover, unlike the Illinois statute, the LPWA does not declare that a contract between the owner and the contractor prohibiting the future filing of liens or claims by anyone "shall be binding." In sum, the LPWA is more favorable to a subcontractor than the Illinois mechanics' lien statute, because the LPWA does not limit his access to Civil Code and LPWA rights and remedies in case the general contractor breaches the contract, and the LPWA does not make breach of contract a sine qua non to the subcontractor's right to file a claim or lien against the owner's property.

For these reasons, we are not persuaded by PCS's argument based on the Illinois case and statute.

### c.

PCS does not advance any other argument or authority for the proposition that it, as a third-party beneficiary, may require that the Kaiser-Shaw subcontract's lien waiver provision be enforced despite Shaw's rights of dissolution and restoration evoked by Kaiser's material breach of that contract.[57] Our own research leads

---

[57] PCS cites a number of Louisiana cases cursorily mentioning or using waiver without defining it or discussing its nature, conditions or scope. *Hero & Co. v. Farnsworth & Chambers Co.*, 107 So. 2d 650 (La. 1958); *Wardlaw Bros. Garage, Inc. v. Thomas*, 140 So. 108 (La. App. 2d Cir. 1932); *Babineaux v. Grisaffi*, 180 So. 2d 888 (La. App. 3d Cir. 1965); *Bank of Jena v. Rowlen*, 370 So.

30

only to additional reasons to doubt that the Louisiana Supreme Court would affirm that litigation position.

The Kaiser-Shaw subcontract, after stating that Shaw "agrees to and does waive" its right to file claims and liens against PCS's property, does not expressly state what legal effects the parties intended for the provision to have. The term "waiver" does not appear to have any fixed meaning or connotation in Louisiana law to which it can be assumed that the parties must have referred. The Louisiana Civil Code, which regulates nominate contracts and juridical acts in detail, does not provide definition or regulation for a contract or act of waiver.[58] The LPWA does not define or

---

2d 146 (La. App. 3d Cir. 1979); *Executive Office Centers, Inc. v. Cournoyer*, 433 So. 2d 324 (La. App. 4th Cir. 1983). *See also Union Texas Petroleum v. PLT Eng'g*, 895 F.2d 1043, 1053 n.16 (5th Cir. 1990); *Toomer v. Price*, 122 So. 856, 856-58 (La. 1929). However, these cases do not address or support PCS's position that, as third party beneficiary, it may assert greater or better rights against Shaw than Kaiser, its stipulator-promisee, after Kaiser's material breach of the subcontract of which the third party stipulation was a part. And, while these cases may support a conclusion that Louisiana courts will enforce "lien waivers" executed in exchange for contemporaneous payment or alternate security, they are not support for enforcement of a waiver where there has been a failure of cause or consideration or material breach of a commutative contract. As Shaw correctly points out, they are distinguishable factually, contractually, and on other grounds. Shaw's 2d brief, pp. 11-13.

[58] The Civil Code in several articles provides for the "renunciation" of certain accrued or existing rights. *See* La. Civ. Code art. 626 (usufruct); *id.* arts. 737 & 771-772 (predial servitudes); *id.* arts. 963-966 (successions); *id.* art. 1780 (obligations with a term); *id.* art. 1802 (solidary obligations); id. 2348 (matrimonial regimes); *id.* art. 2978 (sequestration); *id.* art. 3029 (mandate); *id.* arts. 3449-3451 (prescription). The

regulate waiver either.[59]

We have found but three cases in which the Louisiana Supreme Court comprehensively defined "waiver." In two insurance coverage cases, involving whether an insurer had waived a coverage exclusion, and whether an insurer had waived a condition precedent of sound health, the state high court stated that "[w]aiver occurs when there is <u>an existing right, a knowledge of its existence</u> and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished."[60] In a third case the Louisiana Supreme Court, in deciding whether homeowners had waived their rights to sue the builder for noncompliance with building plans and specifications, defined waiver in similar but more

---

Code does not, however, provide a general definition of "renunciation" applicable to other rights.

[59] La. R.S. § 9:4801, *et seq.*

[60] *Steptore v. Masco Constr. Co., Inc.*, 643 So. 2d 1213, 1216 (La. 1994) (emphasis added)(citing *Tate v. Charles Aguillard Ins. & Real Estate, Inc.*, 508 So. 2d 1371 (La.1987); *Ledoux v. Old Republic Life Ins. Co.*, 233 So. 2d 731 (La.App. 3d Cir. 1970); *Peavey Co. v. M/V ANPA*, 971 F.2d 1168 (5th Cir.1992)). In *Tate v. Charles Aguillard Insurance & Real Estate, Inc.*, the court stated: "Of course, reliable proof of such a knowing and voluntary waiver is necessary and the burden of producing it, as in the proof of obligations generally, falls on the party who demands performance." 508 So. 2d at 1375 (citing La. Civ. Code art. 1831; *id.* art. 2232 (1870); *see also* BLACK'S LAW DICTIONARY 1574 (7th ed. 1999)("The party alleged to have waived a right must have had both knowledge of the existing right and the intention of forgoing it.").

32

comprehensive terms: "Though there are various definitions of the term 'waiver', it can be comprehensively defined as a voluntary and intentional relinquishment or abandonment of <u>a known existing legal right</u>, advantage, benefit, claim, or privilege, which except for such waiver the party would have enjoyed."[61]  If these waiver definitions apply here, Shaw would not have been able, when the Kaiser-Shaw subcontract was formed, to waive a right to file claims and liens against PCS's property.  Shaw had no <u>known existing legal</u> right to file a claim or lien against PCS at the inception of the subcontract under which it had not yet performed any work.  We are not called upon to make an *Erie* guess as to whether the Louisiana Supreme Court would apply those definitions of waiver here. But their existence in the court's jurisprudence is consistent with our undiminished *Erie* duty to follow and apply the Louisiana Supreme Court's rule against finding that a party has waived the right of dissolution of a contract, unless she "express[es] her intent to relinquish that right in words that make specific reference to the action to dissolve[.]"[62]

In sum, we have not discovered any basis in Louisiana law for concluding that a third party beneficiary, such as PCS, has a right to demand performance from the promisor, like Shaw, even though the

---

[61] *Breaux v. Laird*, 88 So. 2d 33, 38 (La. 1956)(emphasis added).

[62] *Supra*, n. 34.

contracting party through which the beneficiary claims, Kaiser, the stipulator-promisee here, has materially breached the underlying contract and caused its dissolution. PCS's reliance on inapposite Illinois authority indicates that it also was unable to find Louisiana law to support its position. Consequently, in the absence of clear language in the subcontract to the contrary, we conclude that Shaw did not relinquish, but may enforce, its right to dissolution, and restoration. Consequently, PCS may not enforce the dissolved lien waiver provision against Shaw. Accordingly, unless we find merit in PCS's alternative argument, Shaw is entitled to enforce its claim and lien, holding PCS liable under the LPWA.

## IV.

### A.

Alternatively, PCS urges us to affirm the summary judgment in its favor on a ground that the magistrate judge did not reach, viz., that the statement of claim and privilege filed by Shaw did not reasonably identify the immovable with respect to which its work was performed.

The LPWA provides that a statement of a claim or privilege must reasonably identify the immovable with respect to which the work was performed and its owner.[63] "The purpose of a statement of claim or privilege is to give notice to the owner (and contractor)

---

[63] La. R.S. 9:4822.G.(3)

34

of the existence of the claim and to give notice to persons who may deal with the owner that a privilege is claimed on the property."[64] "Technical defects in the notice should not defeat the claim as long as the notice is adequate to serve the purposes intended,"[65] The filing of a statement of a claim or privilege is accomplished when it is filed for registry with the recorder of mortgages of the parish in which the work is to be performed.[66] Each filing made with the recorder of mortgages which contains a reference to immovable property shall contain a description of the property sufficient to clearly and permanently identify the property. A description which includes the lot and/or square and/or subdivision or township and range meets the requirement of the Act.[67] Naming the street or mailing address without more is not sufficient.[68]

On February 17, 1999 Shaw filed with the recorder of mortgages in Ascension and Iberville Parishes an amended and supplemental statement of claim and privilege in the amount of $5,350,000 (modifying its original statement of claim and privilege for

---

[64] *Id.*, cmt. (g)(citing Mercantile Nat. Bank of Dallas v. J. Thos. Driscoll, Inc., 195 So. 497 (La. 1940); See Hibernia National Bank v. Belleville Historic Development, L.L.C., 815 So.2d 301,*306 (La. App. 4th Cir. 2002).

[65] *Id.*

[66] La. R.S. 9:4831.A.

[67] La. R.S. 9:4831.C.

[68] *Id.*

35

$1,389,707.04 filed January 27, 1999)[69] for labor, equipment, materials and other engineering and construction services supplied to Kaiser to improve the immovable property of PCS. To describe PCS's tract of land upon which its plant is located, it appears that Shaw used the surveyor's legal property description contained in the deed by which PCS acquired title to the tract. The tract evidently borders on the Mississippi River at the boundary line between Ascension and Iberville Parishes, so that the tract includes land contiguously located in each parish. In other words, the line between the parishes runs through PCS's tract and intersects its river-front boundary at some point not precisely disclosed in this record. The surveyor's legal description does not attempt to specify which part of the tract lies in each parish but simply begins by stating that the land is located east of the Mississippi River in Ascension and Iberville Parishes.[70]

---

[69] Shaw's original statement of claim and privilege filed January 27, 1999 in both parishes was essentially the same as the amended and supplemental statement, except for lesser amount of $1,389,707.04. The same surveyor's legal property description was attached as in Exhibit A of the amended and supplemental statement. Both statements were filed timely and are essentially the same in other respects. Therefore, we will discuss in detail only the amended and supplemental statement of February 17, 1999.

[70] The property description begins:
Legal Description
South Tract
A TRACT OF LAND LOCATED IN SECTIONS 74, 75, &T95-R/E SECTIONS 38, 39, & 40, T95-R2E, SOUTHEASTERN DISTRICT, EAST OF MISSISSIPPI RIVER, ASCENSION & IBERVILLE PARISH, LOUISIANA

36

Apparently, the same deed of acquisition using the same surveyor's legal description was recorded by PCS in both Ascension and Iberville Parishes. In any event, it is undisputed that Shaw's statement of claim and privilege uses the only legal description pertaining to PCS's property that is recorded in Ascension and Iberville Parishes.  Also, it is undisputed that PCS has not made available to Shaw any other legal property description to substitute for the legal property description recorded in the two parishes.

It is evident from the property description that the PCS tract upon which the construction was performed is bounded by identifiable railroad, electric utility, state highway rights of way, and by identifiable tracts owned by a number of other named industries, as well as the Mississippi River.[71]   It is undisputed

---

[71] More specifically, Shaw's amended and supplemental statement of claim provides, in pertinent part, as follows:

> ICF Kaiser Engineers, Inc...entered into a contract with the Owners of certain property believed to be PCS Nitrogen Fertilizer,L.P....whose address is Louisiana Highway 3115 and 30, Post Office Box307, Geismar, La 70734 to provide labor, equipment, materials and other construction services for the construction of a project called "1265 STPD NITRIC ACID FACILITY."

> ...Pursuant to [the Kaiser-Shaw] subcontract, SHAW supplied labor, equipment, materials and other engineering/construction services to...Kaiser...to improve the immovable property described...below.

> The subject immovable property, upon which the work was performed, is owned by...PCS Nitrogen Fertilizer, L.P....which immovable property is further described on

that the 1265 STPD Nitric Acid Facility was erected at the PCS plant located within the described PCS tract near Geismar, Louisiana;[72] that the prime PCS-Kaiser contract provides that PCS will pay Kaiser $38,890,000 for the construction of the 1265 Nitric Acid Facility;[73] and that Shaw was not paid $5,350,000 for the labor, equipment, materials and other engineering/construction services that it alone had contributed to the project.

The Louisiana courts have not added any legal gloss to the LPWA's requirement that a statement of a claim or privilege shall "reasonably identify" the property with respect to which the work was performed, for the purpose of notifying the owner, contractor, and persons dealing with the owner that a privilege is claimed on the property, and should be upheld despite technical defects if the notice is adequate to serve the purposes intended.[74] They have

Exhibit A attached hereto and made a part hereof.

Exhibit A consists of a surveyor's lengthy metes and bounds property description, entitled and commencing as follows:

Legal Description
South Tract
A TRACT OF LAND LOCATED IN SECTIONS 74, 75, &T95-R/E SECTIONS 38, 39, & 40, T95-R2E, SOUTHEASTERN DISTRICT, EAST OF MISSISSIPPI RIVER, ASCENSION & IBERVILLE PARISH, LOUISIANA

[72] See PCS Br. at 9.

[73] 2 R. at 302.

[74] *See, e.g.*, Hibernia Nat. Bank v. Belleville Historic Development, L.L.C., 815 So.2d 301, 305-306 (La.App. 4th Cir.

simply applied the unvarnished statutory standards and terms to each varying factual situation to determine whether the worksite was reasonably identified so as to provide adequate notice of the claim and privilege to the owner, contractor and persons dealing with the owner.[75]

Applying the pertinent LPWA provisions, as we think the Louisiana Supreme Court would, we conclude that reasonable minds must find that Shaw preserved its claim and privilege by, inter alia, "reasonably identify[ing] the immovable with respect to which the work was performed...and the owner thereof."[76] The legal description identifies PCS's industrial tract on the Mississippi River with certainty according to surveys by a registered professional land surveyor with references including state plane coordinates, certain section corners, metes, bounds and identifiable landmarks. PCS does not dispute the fact that the 1265 Nitric Acid Facility was constructed at PCS's plant located

---

2002)("[S]trict construction cannot be so interpreted as to permit purely technical objections to defeat the real intent of the statute, which is to protect materialmen, laborers and subcontractors who engage in construction projects.")(citing Bernard Lumber Company, Inc. V. Lake Forest Construction Co. Inc. 572 So.2d 178 (La. App. 1 Cir. 1990); Authement's Ornamental Iron Works v. Reisfeld, 376 So.2d 1061 (La. App. 4th Cir.1979); Morgan v. Audubon Const. Corp., 485 So.2d 529 (La. App. 5 Cir. 1986)) Norris Rader, Inc. v. Swilley, 625 So.2d 1125 (La. App. 3 Cir. 1993).

[75] *Id.*

[76] La. R.S.9:4822.G.(3).

within PSC's industrial river-front tract.  It is also evident from the foregoing that the 1265 STPD Nitric Acid Facility is a substantial construction or edifice with a distinctive name located in PCS's plant on the clearly and certainly described river-front industrial tract. Consequently, we conclude that by furnishing the surveyor's legal property description---which  described PCS's industrial tract on the Mississippi River, wherein PCS's plant was located, in which the distinctly named, substantial 1265 STP Nitric Acid Facility was built—-Shaw reasonably identified the property with respect to which the work was performed and the owner thereof. Thus, Shaw's statement of claim and privilege fulfills its purpose of "giv[ing] notice to the owner (and contractor) of the existence of the claim and [gives] persons who may deal with the owner that a privilege is claimed on the property."[77] Because the "notice is adequate to serve the purposes intended" any "[t]echnical defects in the notice should not defeat the claim." [78]

PCS argues that Shaw did not reasonably identify the property where the work was done because the property description of PCS's river-front industrial tract was "too broad" to pin-point the site of the 1265 STPD Nitric Acid Facility. But the surveyor's description of PCS's unsubdivided industrial tract was the

---

[77] *Id.* Cmt. (G).

[78] *Id.*

40

starting, not the ending, point. Additionally, because of the magnitude of the construction, the fact that the structure or building was called by its specific, distinctive name, and the undisputed fact that it was designed and built as an improvement to PCS's plant within the certainly described tract, there was a reasonable identification of the place where the work was done so as to give notice of the claim to persons who may deal with the owner that a privilege is claimed on the property. Because it was adequate to serve this purpose, its technical defects, if any, do not defeat the claim.

The cases upon which PCS relies are inapposite. *In re Lurgi-Knost, Inc.*, was a federal court decision predating the 1981 LPWA revision holding that a lien affidavit, stating that materials "were actually used in the construction of additions at the plant site [of] Enjay Chemical Co., Baton Rouge, Louisiana[,]" was too general to be effective because there was no legal description of the plant site, and "there is nothing in the affidavit to even vaguely indicate which building or structure and which lot or parcel of ground may be involved."[79] Shaw's affidavit, in contrast, specifies far more than the owner's plant in or near a certain city; it also provides a surveyor's detailed legal description of the parcel containing the owner's plant, and, in particular, names

_____

[79] 380 F.Supp. 400, 403 (M.D.La. 1974).

41

specifically the $38 million 1265 STPD Nitric Acid Facility edifice built at the plant with Shaw's labor, materials and services. Among other reasons, the lien in *Samedan Oil Corp. V. Ultra Fabricators, Inc.,* was invalid because the "steel structures" fabricated were not identified and there was "no block number or specific legal description" of the owner's property.[80] As we have explained, Shaw's claim and privilege does name the particular structure upon which the work was done and describes its location with reference to a specific legal description that includes specific sections, townships and ranges, among other identifiers. Finally, *Boes Iron Works v. Spartan Building Corp.,* is the most inapposite because it held a lien to be invalid on account of its identification of the property only by its municipal address.[81] Shaw, of course, did not place its reliance on a municipal address but used the multiple factors already described.

### B.

Applying Section 4833 of the LPWA,[82] the magistrate judge ruled that Shaw, without reasonable cause, failed to cancel its claims and privileges in response to PCS's written request and assessed

---

[80] 737 So.2d 846, (La. App. 3d Cir. 1999).

[81] 648 So.2d 24 (La. App.4th Cir. 1994).

[82] La. R.S. 9:4833.

damages and attorneys fees against Shaw. After reviewing the record, however, we conclude that Shaw acted with reasonable cause and should not be taxed damages and attorneys fees.

The LPWA provides that, if a statement of claim or privilege is improperly filed, an owner may require the filing party to give written authorization for the recorder of mortgages to cancel the statement of claim or privilege from the records.[83] If the person who filed the statement of claim or privilege fails, without reasonable cause, to comply with the request within ten days, he shall be liable for damages suffered by the owner as a consequence and for reasonable attorney's fees incurred in obtaining cancellation.[84]

Shaw filed its claim and privilege on January 27, 1999 in Ascension and Iberville Parishes and its amended and supplemental claim and privilege in both parishes on February 27, 1999. On October 20, 2000 PCS's attorney sent Shaw's attorneys a letter demanding that Shaw cancel its claims and liens in both Ascension and Iberville parishes and dismiss this action with prejudice within 10 days. Shaw's attorney responded on October 26, 2000 that Shaw would not cancel its filings or dismiss this suit under the LPWA because, *inter alia*, Kaiser had materially breached the

---

[83] La. R.S. 9:4833.A.

[84] La. R.S. 9:4833.B.

subcontract giving Shaw the right under Civil Code article 1982 to raise against PCS all defenses it could raise against Kaiser.

In parts II & III of this opinion we conclude that, because Kaiser materially breached the Kaiser-Shaw subcontract, Shaw had a right under Civil Code articles 2013 et seq. to consider the subcontract dissolved and to be restored to its position before entering the subcontract; and Shaw had a right under Civil Code article 1982 to use these rights in defense against PCS. Thus, because Shaw was no longer obliged by the dissolved subcontract to refrain from filing liens or claims against PCS's property, Shaw had the right to file the statements of claim and privilege against PCS's property upon which Shaw's work was performed. Consequently, Shaw's claim and privilege were properly filed, and it had reasonable cause to refuse to cancel them from the mortgage records.

The magistrate judge also decided, however, that Shaw should be assessed damages and attorney's fees because it acted unreasonably in failing to cancel its claim and lien in Iberville Parish because it knew that none of its work had been performed on PCS's property in the parish. But there is no support in the record or basis in law for the magistrate judge's decision in this respect either. Because the Ascension-Iberville line runs through PCS's industrial tract and plant, Shaw did not know whether its

44

work had been performed in one or both of these parishes.[85]  Thus, when PCS filed a written request that Shaw cancel its claims and privileges in both parishes and dismiss its lawsuit on October 20, 2000, Shaw had reasonable cause to refuse to comply.

PCS did not send Shaw any other written request for cancellation of a claim or privilege.  Therefore, Shaw was not called upon to consider making any response to a written request for cancellation other than PCS's October 20, 2000 in globo request.  Consequently, Shaw was never without reasonable cause to refrain from cancelling any of its claims or privileges.

PCS's January 4, 2001 amendment of its counterclaim to allege that Shaw had refused to cancel its liens in both parishes and to

---

[85] The magistrate judge apparently concluded that PCS owned property on both sides of the river and that the nitric acid facility's location with respect to the river would have made clear to Shaw in which parish the work was done. R. at 0683. However, the legal description of the property establishes that the whole of the property in question is east of the river.  The surveyor's description included in Shaw's statement of claim and privilege begins

Legal Description
South Tract

>    A TRACT OF LAND LOCATED IN SECTIONS 74, 75, &T95–R/E
>    SECTIONS 38, 39, & 40, T95–R2E, SOUTHEASTERN DISTRICT,
>    <u>EAST OF MISSISSIPPI RIVER</u>, ASCENSION & IBERVILLE
>    PARISH, LOUISIANA

(emphasis added) and the description of the north tract begins similarly. The parish line runs essentially perpendicular to the river, therefore the position of the nitric acid facility relative to the river would not, in and of itself, make clear in which parish the work was done.

pray for damages and attorney's fees cannot be considered as such a request because it related only to Shaw's rightful refusal to comply with PCS's October 20, 2000 request. Nor can we so consider PCS's subsequent filing of an affidavit by Robert D. Brinker, its Lead Process Supervisor, dated February 15, 2001 that "[t]he 1265 STPD Nitric Acid Facility is located [o]n a tract of land 160 feet x 180 feet, located exclusively in Ascension Parish." That instrument did not request Shaw to do anything. Moreover, Mr. Brinker's affidavit did not furnish Shaw with satisfactory proof that none of its work had taken place in Iberville Parish. According to his affidavit Mr. Brinker is a "Lead Process Supervisor," not an attorney or a surveyor, and does not show that he is qualified to determine the position of the parish line with respect to PCS's plant or the 1265 STPD Nitric Acid Facility. Furthermore, the affidavit does not give any factual basis for such a determination by Mr. Brinker, does not show that Mr. Brinker's opinion as to the location of the parish line with respect to Shaw's work has a reliable basis, and does not contain a suitable legal description by which anyone could determine the location of the 160 feet x 180 feet tract conclusorily referred to by Mr. Brinker.

Conclusion

For the reasons assigned, we reverse the judgment of the

46

magistrate judge and instead render judgment in favor of Shaw and against PCS, on the issue of liability only, for the recognition of the validity of Shaw's claim and privilege under the LPWA against PCS personally, and against its property upon which Shaw's work was performed, for the amounts to be determined in further proceedings consistent with this opinion, and for the assessment of all costs of these proceedings against PCS.

**Magistrate Judge's Judgments REVERSED; Judgment RENDERED, on the issue of liability, recognizing Shaw's right to enforce its claim and privilege against PCS personally and against PCS's property upon which Shaw's work was performed, for amounts to be determined in further proceedings, and the assessment of all costs of these proceedings against PCS. REMANDED for further proceedings consistent with this opinion.**