**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 17, 2009

Charles R. Fulbruge III
Clerk

No. 08-30594

SHAW CONSTRUCTORS,

Plaintiff - Appellee Cross-Appellant

v.

PCS NITROGEN FERTILIZER LP,

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Middle District of Louisiana
No. 3:99-CV-254

Before KING, GARWOOD, and DAVIS, Circuit Judges.

PER CURIAM:[*]

In a previous appeal in this case, we held that PCS Nitrogen Fertilizer, L.P. was liable to Shaw Constructors under the Louisiana Private Works Act for subcontract work performed in connection with a construction project. *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533 (5th Cir. 2004). We rendered judgment only as to liability and remanded the case in order for the magistrate judge to determine the amount of liability. After a six-day trial, the magistrate judge entered a judgment in the amount of $1,455,060.47. PCS

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Nitrogen Fertilizer appealed the judgment and Shaw Constructors filed a cross-appeal asserting that the magistrate judge erred in calculating interest. For the reasons stated below, we reverse and remand only on the issue raised in the cross-appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

PCS Nitrogen Fertilizer, L.P. ("PCS") entered into a contract with ICF Kaiser Engineers, Inc. ("Kaiser") for the construction of a nitric acid production plant. Kaiser subcontracted the piping installation to Shaw Constructors, Inc. ("Shaw"). For reasons which are contested in this appeal, Shaw's work fell significantly behind schedule. This delay resulted in Kaiser and Shaw entering into a change order that converted their original lump-sum contract into a cost-reimbursable contract. "Change Order No. 1" states, in relevant part:

> As compensation for the remaining Subcontract Work, commencing as of the start of business on August 3, 1998 through Project completion, the Subcontractor will be reimbursed for reasonable and necessary costs . . . .

> Furthermore, a Not-to-Exceed (NTE) total amount of $7,677,918.00 . . . has been established for compensation of costs incurred during the performance of all of the work associated with this Subcontract. It is mutually understood by the parties that the NTE amount may have to be adjusted if reasonable and necessary costs incurred during the performance of the work exceed the total NTE amount. If Contractor observes Subcontractor invoicing for, performing, or reporting work which falls outside of "reasonable and necessary," Contractor will endeavor to transmit this information to the Subcontractor within 7 days of witnessing the non-conforming work so that billing or field work corrections can be made.

The change order retained the unaltered provisions of the original subcontract including the following prohibition against oral modifications: "No amendment, variance or change in the provisions of this Subcontract shall be made except in writing signed by the authorized representatives of the parties hereto."

2

Thereafter, Kaiser fell behind on its payments to Shaw and eventually terminated Shaw from the project prior to completion. Kaiser hired a different company to complete Shaw's scope of work. Shaw then filed a lien against PCS and a lawsuit against both PCS and Kaiser seeking to collect its unpaid invoices. As a result of this lawsuit, Kaiser and Shaw, but not PCS, entered into a Compromise Agreement. In this agreement, Kaiser agreed to make 20 monthly payments to Shaw of $291,012, which represented the full amount of Shaw's outstanding invoices plus two extra monthly payments for interest.

Kaiser filed bankruptcy after making only 13 monthly payments under the Compromise Agreement. Rather than pursue its claim in Kaiser's bankruptcy proceeding, Shaw elected to recover the remaining balance of its invoices from PCS by enforcing the statutory lien granted to it under the Louisiana Private Works Act ("LPWA"). PCS defended by relying on a provision in the original subcontract whereby Shaw waived its right to file liens against PCS's property. This dispute was the basis of the first appeal in this case. We concluded that, under Louisiana law, Shaw could regard the subcontract as dissolved upon Kaiser's breach and PCS could not prevent Shaw from enforcing its LPWA lien. *Shaw Constructors*, 395 F.3d at 536. We remanded the case solely for determination of the amount that PCS owed Shaw under the LPWA. *Id.* at 555.

After a six-day bench trial, the magistrate judge concluded that: (1) the reasonable and necessary costs of Shaw's work totaled $11,631,045.20, which was the full amount that it had invoiced Kaiser; (2) Shaw and Kaiser mutually agreed to exceed the NTE amount stated in the change order; (3) under the LPWA, Shaw was entitled to recover from PCS the remaining balance of the price of the work performed pursuant to the subcontract and the change order; (4) the balance owed for work under the subcontract and change order was $5,238,217.90, but PCS received credit for the $3,783,157.43 in payments made by Kaiser under the Compromise Agreement; (5) PCS was therefore liable to

3

Shaw for $1,455,060.47 plus prejudgment interest on that amount from February 23, 1999, the date of judicial demand; and (6) Shaw did not breach its duty to mitigate damages by failing to pursue its claim in Kaiser's bankruptcy proceeding. PCS filed a timely appeal of the judgment and Shaw filed a cross-appeal regarding the calculation of interest.

## II. DISCUSSION

This appeal involves both findings of fact, which we review for clear error, and conclusions of law, which we review de novo. *Triad Elec. & Controls, Inc. v. Power Sys. Eng'g, Inc.*, 117 F.3d 180, 186 (5th Cir. 1997). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

PCS raises the following issues regarding the magistrate judge's findings of fact and conclusions of law: (1) whether Kaiser and Shaw mutually agreed to exceed the NTE amount; (2) whether all of Shaw's costs were reasonable and necessary; and (3) whether Shaw breached its duty to mitigate by failing to pursue its claim in Kaiser's bankruptcy proceeding. Additionally, both parties challenge the magistrate judge's calculation of interest.

A. *Did Kaiser and Shaw mutually agree to exceed the NTE amount?*

Although PCS continues to assert that the NTE amount could only have been amended through a written agreement pursuant to the prohibition against oral modifications in the original subcontract, the magistrate judge correctly looked to the conduct of the parties to answer this question because, under Louisiana law, "'[w]ritten contracts for construction may be modified by oral contracts and by the conduct of the parties, and this is true even when the written contract contains the provision that an owner is liable only if the change orders are in writing.'" *L&A Contracting Co., Inc. v. Ram Indus. Coatings, Inc.*,

762 So. 2d 1223, 1232 (La. Ct. App. 2000) (quoting *Pelican Elec. Contractors v. Neumeyer*, 419 So. 2d 1, 5 (La. Ct. App. 1982)).

The magistrate judge concluded that Kaiser and Shaw had mutually agreed to exceed the NTE amount because: (1) Kaiser never advised Shaw that it could not exceed the NTE amount; (2) Kaiser never advised Shaw that it had exceeded the NTE amount and should cease performance; (3) Kaiser never advised Shaw that any of its work was not reasonable or necessary; (4) Kaiser later agreed that Shaw was owed an amount in excess of the NTE amount; and (5) Kaiser actually made payments to Shaw in excess of the NTE amount.

The fourth and fifth facts were derived from the Compromise Agreement and the payments made under it. PCS argues that this reliance on the Compromise Agreement violated Rule 408 of the Federal Rules of Evidence. Rule 408 provides that the compromise of a claim "is not admissible on behalf of any party, when offered to prove [the] . . . amount of a claim that was disputed." It does not, however, "require exclusion if the evidence is offered for purposes not prohibited by subdivision (a)."

PCS's argument fails because the purpose behind the magistrate judge's use of the Compromise Agreement was not to establish the amount of the claim.[1] Rather, the Compromise Agreement was used to refute PCS's defense that the NTE amount limited its total potential liability to Shaw.[2] The NTE amount

---

[1] Shaw filed a Motion in Limine for Determination of the Proper Method of Measuring Damages, arguing that the amount owed by PCS was Kaiser's balance due under the Compromise Agreement. The magistrate judge ruled that in order to determine the "price" of its work under the LPWA, the court would look to the terms of the subcontract between Shaw and Kaiser. Since the default judgment entered against Kaiser was not binding on PCS, Shaw would have to show that its work was recoverable under the subcontract (i.e., it was reasonable and necessary). Thus, the amount of the claim was determined based on the reasonable and necessary expenses that Shaw proved at trial.

[2] PCS argued that the NTE amount was a strict cap such that it had the practical effect of converting the contract back into a lump sum contract based on *Allan E. Amundson, Inc. v. Hoppmeyer*, 442 So. 2d 1254 (La. Ct. App. 1983). The fixed-price contract in *Amundson*

5

could be exceeded if it was "mutually understood by the parties that . . . reasonable and necessary costs incurred during the performance of the work exceed[ed] the total NTE amount." Therefore, the material fact raised by PCS's defense was whether Kaiser and Shaw's conduct evidenced their mutual understanding that reasonable and necessary costs had exceeded the NTE amount. In other words, the magistrate judge used the Compromise Agreement as evidence of the fact that the parties had agreed to an upward adjustment of the NTE amount, but not as evidence for the specific amount of that upward adjustment.

The other facts relied on by the magistrate judge relate to Kaiser's failure to raise any objection to Shaw exceeding the NTE amount. PCS argues that Kaiser's passivity was insufficient to "waive" the NTE amount and that there was no affirmative evidence that Kaiser ever intended to allow Shaw to exceed the NTE amount. However, the language of the change order does not require such an affirmative waiver from Kaiser. Rather, the change order suggests that Kaiser should notify Shaw of any non-conforming work within seven days so that it would not be charged for unreasonable or unnecessary work. It was within reason for the magistrate judge to infer that Kaiser's failure to object to any of Shaw's expenses was an implicit acknowledgment that the reasonable and necessary costs had exceeded the NTE amount.

Therefore, we conclude that the magistrate judge's finding of fact that Kaiser and Shaw mutually agreed to exceed the NTE amount was not clearly erroneous.

B.      *Were all of Shaw's costs reasonable and necessary?*

_____

stated that if the cost-plus amount was *less* than the fixed price, then the final price would be the cost-plus amount. *Id*. at 1255. But, if the cost-plus amount exceeded the fixed price, then the final price would be the fixed price. *Id*. That is not the case here where the change order does not contemplate Shaw bearing the risk of excess costs. If reasonable and necessary costs exceeded the NTE amount, Shaw would be paid all of its costs.

The parties presented competing versions of what caused Shaw's portion of the project to run over its original deadline and budget. PCS contended that the delays were caused by Shaw's inefficiency and poor workmanship. Shaw contended that the delays were caused by Kaiser's voluminous revisions to the project's engineering plans. Both parties put on evidence and called witnesses in support of their argument. The magistrate judge found Shaw's version more credible and explained in detail why Kaiser's alterations were the cause of Shaw's delay.[3]

PCS's argument that this finding of fact was erroneous relies heavily on its expert witness, William Kelly, who testified that Kaiser's alterations made after the date of the change order were minor and would have only cost between $184,000 and $336,000 to complete as a stand-alone project. The magistrate judge, however, discredited this testimony because it was "not supported by the undisputed facts that existed during and in the months immediately following Shaw's work at the PCS site." In other words, this estimate was based on usual and ordinary conditions, rather than the actual circumstances of Kaiser's previous engineering errors. We cannot say that the magistrate judge's discrediting of this testimony was clearly erroneous, particularly in light of the testimony presented describing Kaiser's engineering errors. *See* FED. R. CIV. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

PCS also claims that the magistrate judge erred by placing the initial burden on it to establish that costs were unreasonable rather than on Shaw to

---

[3] The magistrate judge concluded that "[e]ven after Change Order No. 1 . . . significant changes and difficulty with the engineering design continued. Kaiser's defective engineering and engineering errors had a substantial impact on the completion and the cost of the project. The time and cost to complete the project greatly increased." The magistrate judge's final conclusion was that "a preponderance of the credible evidence established that the root cause of the delay and cost overruns, including the substantial increase in the time and costs of Shaw's subcontract work, was Kaiser's late, deficient and error-filled engineering design."

7

prove that they were reasonable. This is not an accurate description of the record. After Shaw carried its initial burden of proving that its costs were reasonable and necessary, PCS countered with evidence that the costs were unreasonable. The judge was persuaded by Shaw's evidence and disbelieved PCS.[4]

Therefore, we conclude that the magistrate judge's finding of fact that all of Shaw's costs were reasonable and necessary is not clearly erroneous.

C. *Did Shaw breach its duty to mitigate by failing to pursue its claim in Kaiser's bankruptcy proceeding?*

PCS provides no direct authority holding that a party must pursue a claim in bankruptcy before seeking recovery from a solvent party that is liable on the same debt.[5] It relies instead on the general principle of mitigation. *See* LA. CIV. CODE ANN. art. 2002 ("An obligee must make reasonable efforts to mitigate the damage caused by the obligor's failure to perform."). Based on this, PCS argues that Shaw had a duty to file a proof of claim in Kaiser's bankruptcy proceeding before seeking to recover from it under the LPWA.[6]

---

[4] PCS notes that the magistrate judge concluded that "there is no contemporaneous evidence that Shaw was ever back charged for any delay or defective work, that any analysis or report was ever done during or after the project which showed that the delay or costs overruns on the job were caused by Shaw, or that any of Shaw's invoices included in the total agreed to by Kaiser were not approved or were rejected because they were unreasonable, unnecessary or excessive." This is not the magistrate judge placing the burden on PCS. It is an explanation of why he discredited PCS's explanation of the delays. This quotation followed the magistrate judge's review of the evidence supporting Shaw's theory of causation.

[5] PCS cites *Gifford Hill & Company, Inc. v. Harper*, 262 So. 2d 842 (La. Ct. App. 1972) for the proposition that the owner should receive an offset for any recovery the subcontractor receives from the contractor's bankruptcy estate. However, *Gifford* does not state that a subcontractor is *required* to participate in the contractor's bankruptcy. Rather, it holds that *if* the subcontractor receives a distribution from the contractor's estate, then that amount is deducted from the claim against the owner.

[6] We note that a creditor is not obligated or required to file a proof of claim. *See Simmons v. Savell* (*In re Simmons*), 765 F.2d 547, 551 (5th Cir. 1985). Therefore, failing to file a proof of claim alone is unlikely to breach the duty to mitigate.

8

The magistrate judge determined that there was no duty to mitigate under the LPWA based on *Jefferson Door Company, Inc. v. Forman Construction, Inc.*, 836 So. 2d 552 (La. Ct. App. 2002). *Jefferson Door* involved a similar dispute between an owner, a bankrupt contractor, and—in that case—a material supplier rather than a subcontractor. *Id.* at 553. Rather than pursue the bankrupt contractor, the supplier sought to enforce its materialman's lien, which was also derived from the LPWA, against the owner. *Id.* The owner argued that the supplier owed it a duty to determine that the contractor was not credit-worthy and to not supply it materials on credit. *Id.* The court rejected such a duty. *Id.* at 554–55. However, that preemptive duty is not the same one that PCS claims in this case. The duty here is an after-the-fact duty to mitigate by first pursuing the bankrupt contractor for payment before pursuing the solvent owner.

Assuming *arguendo* that the general rules of mitigation apply to claims under the LPWA, Shaw's conduct would not have breached that duty.

> [C]ourts generally do not determine damages based upon the making of these [mitigation] expenditures unless (1) they are small in comparison to the possible losses, and (2) it is virtually certain that the risks incurred will avoid at least a part of the loss. Damages will not be decreased through showing that a substantial expenditure would have minimized the total loss or that the suggested expenditure may or may not have decreased damages.

*Unverzagt v. Young Builders, Inc.*, 215 So. 2d 823, 825–26 (La. 1968). Pursuing its claim in Kaiser's bankruptcy would have required Shaw to expend monies on legal fees and costs without a definite, certain amount to be gained. Shaw asserts that it made the calculated business decision, based on the advice of its counsel, that filing a proof of claim would increase the likelihood that it would be sued by the Kaiser estate for recovery of the final payment made under the

9

Compromise Agreement as a preferential transfer, thereby potentially resulting in a net loss.

Therefore, we conclude that the magistrate judge did not err in concluding that Shaw did not breach its duty to mitigate damages.[7]

D.    *Issues related to the calculation of interest*

Both parties raise issues regarding the magistrate judge's calculation of interest. PCS argues that interest should have started on the date of the judgment rather than the date of the judicial demand. *See Lone Star Indus. v. Am. Chem., Inc.*, 461 So. 2d 1063, 1069 (La. Ct. App. 1984) ("Interest on the disputed, or unliquidated, portion of the contract price is due from the time the amount became ascertainable, that is from the date of judgment."). Shaw's cross-appeal argues that the magistrate judge miscalculated interest by deducting all of the Compromise Agreement payments from principal as a lump sum.

1.    *On what date should interest begin to accrue?*

The LPWA provides for interest but does not specify the date from which interest should be calculated. The magistrate judge followed Louisiana Civil Code Article 2000, which states in relevant part: "When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by

---

[7] PCS's argument that the magistrate judge erred in excluding the testimony of Kaiser's CFO on Shaw's theoretical distribution from Kaiser's bankruptcy as expert testimony is moot because there was no breach of the duty to mitigate.

Article 2924."[8] The issue, therefore, was on which date did PCS's liability under the LPWA become due.

Citing *Alexander v. Burroughs Corp.*, 359 So. 2d 607 (La. 1978), the magistrate judge concluded that interest began to run on the date of judicial demand. In *Alexander*, the state appellate court awarded the plaintiffs interest from the date of the trial court judgment. *Id.* at 609. The Louisiana Supreme Court reversed, concluding that contractual damages are due from the moment of default and that a party may be in default "'either by the commencement of a suit [or] by a demand in writing.'" *Id.* at 613 (quoting LA. CIV. CODE ANN. art. 1911). It found that "plaintiffs' claim was *ascertainable* on the date of formal demand for 'cancellation' of the purchase . . . and hence interest should run from that date . . . ." *Id.* at 613–14 (emphasis added).

*Lone Star Industries*, the case relied on by PCS, concluded that the "disputed, or unliquidated, portion of a contract price is not due until the amount becomes ascertainable, that is from the date of the judgment." 461 So. 2d at 1069 (citing *Roques v. Alfonso*, 399 So.2d 1294 (La. Ct. App. 1981)). *Roques* cites the same language in *Alexander* which was cited by the magistrate judge.

The Louisiana Supreme Court has since rejected the implication in *Alexander* that interest runs from the date that a debt is ascertainable. *See Trans-Global Alloy, Ltd. v. First Nat'l Bank of Jefferson Parish*, 583 So.2d 443, 457 (La. 1991) ("While we agree that the damages in this case were not ascertainable until reduced to judgment, we nevertheless find that interest should run from the date of judicial demand. That finding is consistent with longstanding Louisiana jurisprudence."). The court determined that the rule

---

[8] The legal interest rate is applicable in this case because the judgment is based on the LPWA and not the Compromise Agreement. *See Long Leaf Lumber, Inc. v. Svolos*, 258 So. 2d 121, 124 (La. Ct. App. 1972) (holding that the contractual interest rate was not binding when the owner was not a party to the agreement between the contractor and the subcontractor containing the interest rate and instead applying the legal rate).

11

that requires damages to be ascertainable is derived from the common law view of interest as punitive in nature.

> According to that view, when damages are reasonably ascertainable, the defendant can determine what his liability might be, and stop the accrual of interest by paying the claim; when the damages are uncertain, however, the defendant cannot determine the extent of his liability prior to trial, and it would be unjust to penalize him for failure to pay the damages before judgment.

*Id.* Conversely, under civil law and the modern understanding of interest, the purpose of interest is to account for the lost time-value of money. *Id.* at 458. Accordingly, the court awarded interest from the date of the judicial demand, not the date of judgment. *Id.* at 459.

Therefore, we conclude that the magistrate judge did not err in concluding that interest should run from the date of judicial demand rather than the date of the judgment.

2. *How should the Compromise Agreement payments be imputed?*

The magistrate judge refused Shaw's request to calculate interest as it actually accrued because "Shaw failed to establish that the unpaid principal amount of the price of its work includes this accrued interest." However, Shaw was not required to prove that it was entitled to accrued interest under the LPWA because Louisiana law provides that "[a]n obligor of a debt that bears interest may not, without the obligee's consent, impute a payment to principal when interest is due. A payment made on principal and interest must be imputed first to interest." LA. CIV. CODE ANN. art. 1866; *see also Ridenour v. Wausau Ins. Co.*, 627 So. 2d 141, 142–43 (La. 1993) (applying Article 1866 because a payment made after the date of judicial demand must be applied to interest before principal). Thus, the LPWA provides for interest and other

12

Louisiana law provides that interest should be calculated as it accrued.[9] Therefore, we remand for entry of a judgment correctly calculating interest by applying the Compromise Agreement payments first to accrued interest and then to principal.

## III. CONCLUSION

For the reasons stated above, the judgment of the district court is AFFIRMED except as to the award of interest, as to which the judgment is REVERSED. The case is REMANDED solely for the entry of a judgment with interest calculated as herein provided. PCS shall bear the costs of this appeal.

---

[9] PCS argues that it should not be liable for interest while Kaiser was making payments under the Compromise Agreement because "extinguishment of the primary contractual obligation extinguishes the statutory liability." LA. REV. STAT. ANN. § 9:4802. The flaw in this argument is that the Compromise Agreement never extinguished the primary contractual obligation, only suspended it. The debt would not be extinguished until the final payment was made, an event which never occurred.