**TRANSOCEAN OFFSHORE DEEPWATER DRILLING, INC., Plaintiff,**

v.

**ENI U.S. OPERATING CO., INC., Defendant.**

**Civil Action No. H–12–1366.**

United States District Court, S.D. Texas, Houston Division.

Oct. 1, 2013.

Steven L. Roberts, John Daniel Johnson, Juan Carlos Garcia, Sr., Sutherland Asbill & Brennan LLP, Houston, TX, for Plaintiff.

Lauren J. Harrison, Jones Walker LLP, Houston, TX, for Defendant.

### ORDER OF ADOPTION

DAVID HITTNER, District Judge.

On September 10, 2013, Magistrate Judge Stephen Wm. Smith issued a Memorandum and Recommendation (Dkt. 48). Plaintiff has filed objections (Dkts. 50, 51).

After due consideration of the entire record and the applicable law, the Court hereby ADOPTS the Memorandum and Recommendation as this Court's Memorandum and Order. It is therefore

ORDERED that defendant's motion for summary judgment (Dkt. 25) is granted.

The court will issue a separate final judgment.

### Memorandum and Recommendation

STEPHEN WM. SMITH, United States Magistrate Judge.

The crux of this maritime dispute is to decide which contractual lease rate applies to a drilling vessel while its operations were interrupted by the federal government's regulatory response to the 2010 Gulf of Mexico oil spill. For the seven month period in dispute, Defendant Eni challenged the amount of plaintiff Transocean's invoices, which were based on the "Standby Rate", and paid them at a lesser rate, the "Repair Rate." Transocean has sued for breach, seeking to recover the nearly $78 million difference in the two rate calculations.

The parties have filed cross motions for summary judgment (Dkt. 24, 25), agreeing that there is no material issue of fact but vigorously disputing how to interpret the contract at issue. Oral argument on these motions was heard on July 11, 2013. For reasons explained below, the Court finds that the Repair Rate applies to the disputed time period. Eni's motion for summary judgment should be granted and Transocean's partial motion for summary judgment denied.

### I. Facts

#### A. The Drilling Contract

On November 17, 2006 the parties signed a Drilling Contract under which Transocean would lease to Eni the vessel *Transocean Amirante,* together with its equipment, personnel, and insurance, for a multi-year period.[1] The vessel was to

1. *See* Dkt. 25–4.

perform operations and services at Eni's drilling sites in the Gulf of Mexico. The Drilling Contract refers to Eni as the "Operator", Transocean as the "Contractor", and the vessel as the "Drilling Unit." The basic Operating Rate that Eni paid to Transocean was $350,000 per day. That rate would remain in effect "unless it is replaced by another rate" specified in the contract.[2]

Among the various rates specified in the contract is the Repair Rate, which is to be paid "for any period during which operations are suspended to permit necessary replacement, regulatory inspection, repair or maintenance of the Drilling Unit."[3] The Repair Rate starts at 98% of the Operating rate ($343,000 per day), but if repairs extend beyond a specified time, it reverts to Zero Rate ($0 per day) until operations are resumed. For the vessel's subsea equipment (which is at issue here), Transocean could charge the Repair Rate for a maximum of 48 hours per month *or* 288 hours cumulatively; after that, the Zero Rate kicked in. Eni argues that this Repair Rate should apply to the disputed time period, July 10, 2010 to February 11, 2011, because the vessel was undergoing a regulatory inspection and repairs required by federal safety rules issued after the 2010 Gulf oil spill.

By contrast, the Standby Rate applies "during any period of delay as a direct result of an act, instruction, or omission of Operator including, but without limitation, the failure of any of Operator's Items, or the failure of Operator to issue instructions, provide Operator Items or furnish services."[4] The Standby Rate is also 98% of the Operating Rate ($343,000), but it does not revert to Zero Rate after a certain period of time, unlike the Repair Rate. Transocean argues that the Standby Rate applies to the period in question, because Eni failed to provide all of Operator's Items under the contract, and failed to issue instructions to Transocean during that time.[5]

## B. Events Giving Rise to the Rate Dispute

In April 2010, the *Amirante* was drilling at Green Canyon block 254# 3 ("Allegheny Well # 3"), 80 miles south of New Orleans.[6] On the night of April 20, another vessel in the Gulf of Mexico, the *Deepwater Horizon,* experienced a blowout at BP's Macondo well. In response, the federal government announced that it would issue new safety regulations. The *Amirante* continued to drill Allegheny Well # 3, reaching total depth (14,768 feet) on May 6, 2010. By May 27, the casing was set, marking the end of the drilling process. The next step was "completion" of the well, which would prepare the well for hydrocarbons to flow. On May 28, Eni applied for a permit from the U.S. Department of the Interior Minerals Management Service ("MMS") to conduct this phase of the operation.[7]

---

2. *Id.* at ¶ 704.

3. *Id.* at ¶ 706.

4. *Id.* at ¶ 705(b). The Standby Rate is also payable in other circumstances which Transocean does not claim to be applicable here.

5. The Drilling Contract includes other rates not relevant here, such as the Force Majeure Rate, which applies when performance is prevented or hindered by, among other things, "dispositions or order of governmental authority." *See* Dkt. 25–4 at ¶ 707. Eni invoked this provision when the Obama Administration temporarily halted offshore drilling in 2010, but Eni ultimately paid the invoices covered by its Force Majeure notice. Neither party contends that the Force Majeure Rate applies to the disputed invoices.

6. *See* Dkt. 25.

7. *See* Dkt. 25–10.

Two days later on May 30, the MMS issued NTL No. 2010–N04 ("NTL–04"),[8] which imposed a six-month moratorium on drilling deepwater wells and ordered abandonment of all wells then being drilled in the Gulf of Mexico. On June 2, the MMS returned Eni's application "for future resubmittal due to deepwater moratorium," [9] effectively denying the application. In accordance with NTL–04, Eni temporarily abandoned the well by plugging it. With no other available projects in the Gulf permissible under the NTL–04 moratorium, the *Amirante* departed the well site on June 9, 2010, and headed to Mobile Middle Bay Port shipyard.[10]

While en route to the shipyard, Eni sent a letter to Transocean explaining that its "inability to utilize the Drilling Unit for operations in the Gulf of Mexico following the completion of Allegheny # 3 Well constitutes a Force Majeure...." [11] Transocean did not necessarily agree that the Force Majeure rate was applicable, but because the Standby Rate and Force Majeure rates were the same dollar amount—$343,000 per day—Transocean did not dispute the rate.

The *Amirante* arrived at the shipyard on June 11, 2010. The crew immediately began conducting routine maintenance. During that time, Eni learned that on June 8 the MMS had issued NTL No. 2010–05 ("NTL–05"). NTL–05 created a new requirement that drilling vessels such as the *Amirante* "must have an independent third party conduct a detailed physical inspection and design review of the BOP [ (Blowout Preventer) ]." [12] Eni hired West Engineering to provide the required inspection and certification. Routine maintenance continued until July 9, 20 10, when West arrived to begin its inspection.[13] West uncovered multiple problems with the BOP.[14]

Over the next several months, the necessary repairs were made. Meanwhile, the moratorium imposed by NTL–04 was officially lifted on October 12, 2010.[15] On January 21, 2011, West issued a certificate of compliance, and three days later Eni obtained a permit to use the *Amirante*.[16] Transocean conducted additional, unrelated repairs for several days, and on February 11, 2011, the *Amirante* finally left the shipyard and resumed operations.[17]

## II. Standard of Review

 Fed. R. Civ. Proc. 56(a) provides that the court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Shaw Constructors v. ICF Kaiser Engineers, Inc.*, 395 F.3d 533, 538–39 (5th Cir.2004). If

---

**8.** *See* Dkt. 25–12. "NTL" stands for "Notice to Lessees."

**9.** *See* Dkt. 25–13.

**10.** *See* Dkt. 30–6.

**11.** *Id.*

**12.** *See* Dkt. 25–18, at 4.

**13.** *See* Dkt. 25–21. Eni paid Transocean $343,000 per day for the time period of June 11, 2010, to July 9, 2010. Neither party contests those payments, so the Court need not

determine whether the appropriate rate was paid during that period.

**14.** *See* Dkt. 25–24. Transocean objected to this document on hearsay grounds. This objection is overruled, as are Transocean's other objections to Eni's evidence (Dkt. 30, App. A).

**15.** *See* Dkt. 25, at 10.

**16.** *See* Dkt. 25–32 & Dkt. 25–33.

**17.** *See* Dkt. 25–35.

there is no genuine issue and one of the parties is entitled to prevail as a matter of law, the court may render summary judgment. *Id.*

■ This contract dispute is governed by general maritime law. "A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading, L.L.C. v. Chemex Ltd.,* 393 F.3d 550, 555 (5th Cir.2004).

### III. Discussion

■ The dispositive legal question is this: under the Drilling Contract, which rate of payment—the Repair Rate or the Standby Rate—applies to the disputed invoice period between July 10, 2010 and February 11, 2011? The competing rate provisions are set out below.

The Repair Rate is found in Paragraph 706 of the Contract and reads in pertinent part:

> The Repair Rate shall be paid for any period during which operations are suspended to permit necessary replacement, regulatory inspection, repair or maintenance of Drilling Unit. The Repair Rate may not be charged for any period in excess of the allowance specified below after which Zero Rate shall apply until operations are resumed.[18]

The Standby Rate at Paragraph 705 has several subparts, but the only one invoked here is (b):

> The Standby Rate specified in Appendix A will be payable as follows:
>
> (b) during any period of delay as a direct result of an act, instruction or omission of Operator including, without limitation, the failure of any of Operator's Items, or the failure of Operator to issue instructions, provide Operator Items or furnish services; ... [19]

If Eni is correct that the Repair Rate applies, then Eni is not in breach of the contract and Transocean's claim must be denied. If Transocean is correct that the Standby rate applies, then it is entitled to an award of damages approaching $78 million. The court turns first to the Repair Rate.

Eni argues that two elements are enough to trigger this rate: (1) a suspension of operations; and (2) a Repair Rate event (i.e. necessary replacement, regulatory inspection, repair or maintenance). Eni points to the summary judgment record demonstrating both conditions were met during the disputed invoice period: vessel operations were suspended, and during the suspension the *Amirante* was undergoing Repair Rate events—replacement of components, inspections required by federal regulations, repairs and maintenance, all of which were necessary before the vessel could resume operations in the Gulf of Mexico.

Transocean strenuously disagrees, urging a more restrictive reading of the contract language. In Transocean's view, the Repair Rate is triggered only if the "suspension of operations ... *results from* a Repair Rate event." Dkt. 30, at 10 (emphasis added). This would mean that the Repair Rate could have been triggered on July 10, 2010, only if there were operations to suspend that day, and Transocean argues there were none. In fact, operations had been suspended a month earlier when, as a result of the drilling moratorium announced by NTL–04, Eni plugged and temporarily abandoned the Allegheny # 3 Well. In other words, according to Transocean, the Repair Rate cannot apply because operations had already been sus-

---

**18.** Dkt. 25–4, ¶ 706.

**19.** Dkt. 25–4, ¶ 705(b).

pended for reasons other than "to permit [a Repair Rate event]."

The Court agrees that a fair reading of the verb phrase "suspended to permit" implies some nexus between the suspended operations and a Repair Rate event, although the nexus is not cause-and-effect in the ordinary temporal sense. After all, repairs do not "cause" a suspension of operations; in fact, the temporal sequence is the reverse—a suspension of drilling operations has to occur *before* any significant repairs can begin. Thus, Transocean's argument that the NTL–05 inspection and repairs did not cause a suspension of operations in July 2010 misses the mark.

The main difficulty with Transocean's argument is its premise that a suspension of operations can result from only a single event. Here it is plain that operations were suspended during the disputed period for at least two reasons: the moratorium imposed by NTL–04, and the regulatory inspection and repairs mandated by NTL–05. A suspension related only to NTL–05 repairs would certainly qualify as a Repair Rate event,[20] while a suspension due solely to the NTL–04 moratorium would not.

The relevant contract language does not require that a Repair Rate event be the sole and exclusive cause of the suspension. Paragraph 706 says that the Repair Rate "shall be paid for any period during which operations are suspended to permit [a Repair Rate event]". This language is permissive, and does not preclude the Repair Rate when operations are suspended for

reasons in addition to a Repair Rate event. Had that been the parties' intent, it would have been easy enough to insert an "only" after "suspended."

It is true that the initial, precipitating cause of the suspension was the NTL–04 moratorium issued on May 30, and that the suspension was already underway when NTL–05 was issued nine days later on June 8, 2010. Again, however, the contract does not specify that a Repair Rate event must be the *initial* cause of the suspension. Both NTL–04 and NTL–05 prevented Eni from operating the *Amirante* when the disputed invoice period started in July 2010, and so it makes no difference which came first in time. As it happened, the moratorium was lifted in October, and so only Repair Rate events mandated by NTL–05 were occurring *throughout* the disputed invoice period.

Transocean contends that Eni had no work for the rig during the disputed period for reasons having nothing to do with the requirements of NTL–05. Transocean points to evidence that the MMS had imposed new regulations upon Eni unrelated to NTL–05 and the condition of the *Amirante,* and that Eni had not complied with those new permitting requirements during the disputed time period.[21] Even if this claim were true, it is also irrelevant, for reasons already explained. The Repair Rate clause does not require that the suspended operations must result *solely* from a Repair Rate event.

At this point it is instructive to contrast the language of the Standby Rate clause. That provision imposes a much a stricter

---

**20.** Transocean's semantic argument that an inspection conducted by a private third party (West) cannot be a "regulatory inspection" is unpersuasive, because it ignores the fact that an independent third party inspection and certification of the BOP was *required* by federal regulation. *See* NTL–05, and its implementing regulation, 75 Fed.Reg. 63,346 (Oct.

14, 2010) (to be codified at 30 C.F.R. Pt. 250). Similarly, there is no doubt that compliance with these regulations was "necessary" before the *Amirante* could legally resume operations in the Gulf.

**21.** *See* Dkt. 30, at 14.

causation requirement than the Repair Rate. The Standby Rate is payable "during any period of delay *as a direct result* of an act, instruction or omission of the Operator ..." (Emphasis added). This phrasing specifically excludes periods of delay not directly chargeable to the Operator's own conduct. While this language does not expressly say that Operator conduct must be the sole cause of the delay—perhaps there may be more than one "direct" cause—it does not encompass periods of delay which are merely the *indirect* result of Operator conduct.

The facts of this case do not fit this limiting condition of the Standby Rate. The extended delay of *Amirante's* operations was the direct result of instructions from the federal government, not Eni. It is true that Eni did not provide permits, certificates, or instructions for the rig to begin operations, but Eni was forbidden by law (first the NTL–04 moratorium, then the NTL–05 regulatory inspection) from doing so. Transocean asks the court to speculate whether Eni could have provided work for the *Amirante* even if NTL–04 and NTL–05 had not been issued. But the Standby Rate is not triggered by hypothetical scenarios. The sequence of events in this summary judgment record demonstrates that Eni suspended operations at Allegheny Well # 3 in direct response to governmental mandates. Whether Eni may have had other work for the *Amirante* to do while the vessel was brought into compliance with federal regulations is beside the point. The delay[22] of the vessel's operations was not the "direct result" of any act, instruction, or omission by Eni.

Finally, Transocean contends that Eni's interpretation of the Repair Rate is improper when the contract is viewed as a whole, including the Standby Rate provisions. The court perceives no conflict on this score. The various contractual rates reflect the parties' careful division of responsibilities and allocation of the risks of downtime. Eni was responsible for all of the "Operator's Items" under the Contract, which included "access to the drilling location," as well as providing the necessary certificates and permits to operate at the drilling location.[23] Transocean, on the other hand, undertook to provide the Drilling Unit as well as safety and protective equipment, warranting that it would comply with all applicable "safety and environmental laws, rules, and regulations, including without limitation those of the ... MMS."[24] Transocean specifically undertook the contractual obligation to maintain its well control equipment such as the BOP "in good condition at all times."[25] Given that Transocean agreed to take responsibility for the condition and regulatory compliance of the BOP, it would be incongruous for Eni to bear the full cost of that regulatory compliance and repair.

## IV. Conclusion

For these reasons, it is recommended that Eni's motion for summary judgment be granted, and Transocean's motion be denied.

The parties have 14 days to file written objections to this recommendation. Failure to file timely objections will limit appellate review to plain error. Fed.R.Civ.P. 72.

---

22. Eni argues there is a meaningful distinction between the terms "delay" and "suspension" as used in the contract, but the Court finds any such distinction immaterial to its analysis.

23. *See* Dkt. 25–4, ¶ 605.

24. *Id.* at ¶ 501(c).

25. *Id.* at ¶ 509.

Signed on September 10, 2013 at Houston, Texas.